12 P.3d 1238

Richard J. KORSAK, Respondent–Appellant,

v.

HAWAII PERMANENTE MEDICAL GROUP, INC., Petitioner–Appellee/Respondent–Appellee,

and

Special Compensation Fund, Respondent–Appellee/Petitioner–Appellee.

No. 21799.

Supreme Court of Hawai'i.

Nov. 28, 2000.

---

Clyde Umebayashi and Muriel M. Taira, Honolulu, (of Kessner Duca Umebayashi Bain & Matsunaga) for Hawai'i Permanente Medical Group, Inc., on the writ.

David M. Robinson, Honolulu, for Richard J. Korsak.

Frances E.H. Lum and Nelson T. Higa, Deputy Attorneys General, for Special Compensation Fund.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

Petitioner-appellee Hawai'i Permanente Group, Inc. (Kaiser) timely applied to this court for a writ of certiorari to review the decision of the Intermediate Court of Ap-

peals (ICA) in *Korsak v. Hawai'i Perma-nente Medical Group, Inc.*, 94 Hawai'i 257, 12 P.3d 357, (App.1999). In its published opinion, the ICA held that respondent-appellant Richard Korsak's low back condition, allegedly exacerbated in a physical therapy session for a compensable work injury, was a compensable consequence of Korsak's primary work injury. Consequently, the ICA reversed the July 15, 1998 decision and order of the Labor and Industrial Relations Appeals Board (LIRAB). Kaiser petitions this court to vacate the ICA's opinion and affirm the LIRAB's decision because the ICA: (1) erroneously applied the statutory presumption of compensability under HRS § 386–85 (1993)[1] (the presumption) to an alleged compensable consequence of a work injury; (2) misapprehended the nature of the substantial evidence necessary to overcome a claim of compensability; and (3) misapplied the applicable standard of review. For the reasons stated herein, we disagree with Kaiser's contentions; however, we granted Kaiser's application for certiorari to clarify several aspects of the ICA opinion.

Respondent-appellee Special Compensation Fund (SCF) also petitioned this court for a writ of certiorari; however, because we hold that its application was untimely, we dismiss the SCF's certiorari proceeding for lack of appellate jurisdiction.

## I. BACKGROUND

Korsak, a Kaiser physician, slipped and fell in Kaiser's parking lot on November 16, 1992 (the 1992 fall) and sustained an injury to his right knee (the primary injury). *Korsak*, at 257, 12 P.3d at 357. The compensability of the primary injury is not disputed. It is also undisputed that Korsak has a significant history of low back problems that pre-existed the 1992 fall. He underwent two back surgeries in the 1970s and was involved in an automobile accident in 1989, in which he sustained a compression fracture and herniated a disc in his back.

Korsak received medical treatment for the knee injury, including an outpatient surgery on January 29, 1993. Thereafter, Korsak underwent a course of physical therapy (PT). He was seen three times in February 1993 by a physical therapist specializing in knee problems. Korsak claims that, during a PT session in early March 1993, while doing a "stretching type exercise, in which you bring your right leg over the left leg," he strained the sciatic nerve, causing him to have severe pain in his leg and lower back (the subsequent injury). The pain did not subside and grew progressively worse over the next several months. Ultimately, the pain made it impossible for him to continue work as a physician and resulted in an unscheduled retirement on January 14, 1994. *Korsak*, at 258, 12 P.3d at 358.

On March 4, 1993, Kaiser filed a workers' compensation report for Korsak's knee injury from the 1992 fall. On October 24, 1994, Korsak sought to add his claim for the subsequent exacerbation of his low back condition. Korsak contended that the subsequent injury was a compensable consequence of the primary injury; he did not claim that he suffered the additional low back injury during the 1992 fall. In light of Korsak's subsequent injury claim and his position that he should be considered for permanent and total disability, the SCF was joined as a party to the claim.

At the hearing before the Department of Labor and Industrial Relations (DLIR), Korsak's claim was substantiated primarily by Roy Sam, M.D., a colleague of Korsak's and former Chief of Physiatry[2] at Kaiser, who stated in a Social Security Administration Evaluation that:

> Postoperatively the patient went to physical therapy and the sports therapist stretched his leg during pulling the right leg over the left. This resulted in a severe strain of the sciatic nerve causing him to

---

1. HRS § 386–85 states in relevant part:
 Presumptions.
 In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:
 (1) That the claim is for a covered work injury[.]

2. Physiatry is the branch of medicine dealing with the diagnosis and treatment of disease and disability by physical means, such as radiation, heat, cold, or electricity. Webster's Third New International Dictionary at 1706–07.

have severe pain in the leg. The patient had epidural blocks and morphine blocks by Dr. Robinson, about four blocks in all. The patient was not helped by these injections.

*Korsak,* at 258, 12 P.3d at 358.

Also, at the hearing before the DLIR, Kaiser claimed that there was no record of the March 1993 PT session. Moreover, Kaiser contended that Korsak's low back condition was not related to the 1992 fall and was, therefore, not a compensable consequence. Kaiser submitted medical opinions from Lee B. Silver, M.D., and James R. Langworthy, M.D., both of whom concurred that Korsak's low back condition was not aggravated by the 1992 fall and that the cause of his low back symptoms was the natural progression of his pre-existing condition. Neither of the foregoing opinions addressed whether Korsak may have exacerbated his condition in the alleged PT incident. Kaiser submitted no direct evidence to contradict Korsak's claimed PT injury.

On December 22, 1995, the Director of the DLIR awarded benefits for Korsak's primary injury only, finding that Korsak did not suffer a compensable back injury because there were no records to substantiate Korsak's allegation of the PT incident. In the decision, the Director found that Dr. Sam's report was not credible on the issue of Korsak's compensability because "what is contained in the report is apparently the history as obtained from [Korsak]."

By letter dated January 9, 1996, Korsak requested reconsideration by the Director or, in the alternative, an appeal to the LIRAB. Enclosed with the request was a letter from Dr. Sam indicating that, although he was not the treating physician, he was the medical supervisor of the PT clinic and had contemporaneous knowledge of Korsak's physical therapy incident and injury.

On January 23, 1996, the DLIR denied Korsak's request for reconsideration and forwarded the case to the LIRAB. Prior to the hearing before the LIRAB, Kaiser submitted a letter and notes from Tom McConnell, the physical therapist who worked with Korsak, for the three sessions in February 1993. No notes were submitted for any PT sessions occurring after that time. Also submitted as evidence was a letter from Bernard Robinson, M.D., that essentially agreed with the conclusions of Dr. Silver.

Only Korsak testified at the hearing before the LIRAB on March 17, 1997. The LIRAB affirmed the Director's denial of compensation for Korsak's low back condition on July 15, 1998. The LIRAB entered the following relevant findings of fact (FOF's) and conclusions of law (COLs):

## FINDINGS OF FACT

. . . .

8. There is a factual dispute on the issue of whether [Korsak] exacerbated his low back during PT for his right knee. Even if [Korsak] developed right sciatica while performing PT for his right knee, however, we do not accept [Korsak's] contention that the PT incident caused his current low back condition.

9. Drs. Lee Silver and James Langworthy performed record reviews and set forth their opinions by reports dated respectively, October 17, 1995 and November 27, 1996.

Dr. Roy Sam, who was not involved in the case either as a treating physician or as an independent medical examiner, set forth his opinion by report dated January 4, 1996.

We accept Drs. Silver's and Langworthy's opinions over that of Dr. Sam, regarding the causation of [Korsak's] current low back condition.

Both Drs. Silver and Langworthy noted [Korsak's] long history of back problems which predated his November 16, 1992 work injury. . . .

According to Dr. Silver, the cause of [Korsak's] continued low back pain is the natural progression of his spinal condition which pre-existed the November 16, 1992 work injury.

According to Dr. Langworthy, the cause of [Korsak's] current back condition is a combination of his earlier herniated disc in the 1970s with two surgeries at that time, combined with a compression fracture and herniated disc in the lower thoracic region from the 1989 MVA.

While Drs. Silver's and Langworthy's reports do not address the issue of whether [Korsak] exacerbated his low back during PT for his right knee, we note that their reports did review Dr. Sam's report . . ., which referenced the alleged PT incident.

10. We find that [Korsak's] current low back condition is the result of the natural progression of his pre-existing low back condition.

## CONCLUSIONS OF LAW

1. We conclude that [Korsak's] low back condition is not a compensable consequence of the November 16, 1992 work injury, because [Korsak's] current low back condition is not causally related to his November 16, 1992 work injury. While [Korsak] contends that he permanently aggravated his low back condition during PT for his compensable knee injury, we have found that Korsak's current low back condition is due to his pre-existing low back problems.

On August 7, 1998, Korsak filed a timely notice of appeal from the LIRAB's July 15, 1998 decision and order. The ICA reversed the LIRAB order on November 10, 1999 "because [Kaiser] failed to produce substantial evidence which expressly, directly, and specifically rebutted the presumption of compensability" under HRS § 386–85. *Korsak,* at 257, 12 P.3d at 358.

Kaiser timely filed a motion for reconsideration on November 22, 1999, in which the SCF joined. The ICA denied reconsideration on December 2, 1999. Subsequently, on December 6, 1999, the ICA sua sponte issued an amended order denying reconsideration, correcting clerical errors within the original order.[3] On December 30, 1999, Kaiser petitioned this court for a writ of certiorari, which we granted on January 4, 2000. On January 5, 2000, the SCF also petitioned this court for a writ of certiorari, which we granted on January 10, 2000.

---

3. Specifically, the original order denying reconsideration erroneously referred to the ICA decision as a "memorandum" opinion, when it actually was a published opinion. Additionally, one

## II. *STANDARD OF REVIEW*

### A. *Agency Decisions*

■ Appellate review of the LIRAB's decision is governed by Hawai'i Revised Statutes (HRS) § 91–14(g) (1993), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g). "Under HRS § 91–14(g), [COLs] are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); [FOFs] are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Potter v. Hawaii Newspaper Agency,* 89 Hawai'i 411, 422, 974 P.2d 51, 62 (1999) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (quoting *Konno v. County of Hawai'i,* 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997) (quoting *Bragg v. State Farm Mutual Auto. Ins.,* 81 Hawai'i 302, 305, 916 P.2d 1203, 1206 (1996))))).

Moreover, we have observed that:

[a]ppeals taken from [FOFs] set forth in decisions of the [LIRAB] are re-

---

of the attorneys of record for the SCF was omitted from the listing of attorneys on the amended order.

viewed under the clearly erroneous standard. Thus, the court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.] The clearly erroneous standard requires the court to sustain the [LIRAB's] findings unless the court is left with a firm and definite conviction that a mistake has been made.

A[COL] ... is not binding on an appellate court and is freely reviewable for its correctness. Thus, the court reviews [COLs] de novo, under the right/wrong standard.

*Bumanglag v. Oahu Sugar Co., Ltd.,* 78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995) (quoting *Tate v. GTE Hawaiian Tel. Co.,* 77 Hawai'i 100, 102–03, 881 P.2d 1246, 1248–49 (1994) (brackets in original)).

*Kahana Sunset Owners Ass'n v. County of Maui,* 86 Hawai'i 66, 68–69, 947 P.2d 378, 380–81 (1997) (some brackets added and some in original).

*Hayashi v. Scott Company,* 93 Hawai'i 8, 11, 994 P.2d 1054, 1057 (2000).

#### B. *Statutory Interpretation*

 "[T]he interpretation of a statute ... is a question of law reviewable de novo." *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

. . . .

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) ... (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993).

*State v. Kotis,* 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (some ellipsis points added and some in original).

### III. *DISCUSSION*

#### A. *Jurisdiction*

 As a preliminary matter, we must determine whether the SCF's application for certiorari was timely. *See Wong v. Wong,* 79 Hawai'i 26, 29, 897 P.2d 953, 956 (1995) (noting that, "[i]n each appeal, the supreme court is required to determine whether it has jurisdiction") (citing *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 119, 869 P.2d 1334, 1338 (1994)). "An appellant's failure to file a timely notice of appeal is a jurisdictional defect that can neither be waived by the parties nor disregarded by the court in the exercise of judicial discretion." *Id.* (citation omitted). Absent jurisdiction, this court has no authority to act on the substantive issues posed by an appeal. *See id.*

Hawai'i Revised Statutes (HRS) § 602–59(a) (1993) provides that decisions of the ICA are subject to review by this court only upon the grant of an application for a writ of certiorari. The application must be filed "no later than thirty days after the filing of the decision of the [ICA]." HRS § 602–59(c) (Supp.1999) (emphasis added). Although the statute does not define "decision of the

[ICA]," Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1(a) (1999) provides:

> No later than 30 days after the filing of *an opinion, dispositional order, or ruling of the [ICA] or the filing of an order denying a timely motion for reconsideration* [4] by the [ICA], any party may apply in writing to the supreme court for a writ of certiorari to review such opinion, dispositional order, or ruling.

Based on the above rule, the application for a writ of certiorari must be filed within thirty days of the denial of a timely motion for reconsideration. In this case, the SCF's January 5, 2000 application for certiorari was filed more than thirty days after the ICA's December 2, 1999 order denying reconsideration, but less than thirty days after the ICA's December 6, 1999 amended order denying reconsideration. Therefore, the question before us is whether a sua sponte order amending a denial of reconsideration extends the time within which an application for certiorari must be filed. HRAP Rule 40.1(a), as well as existing Hawai'i case law, is silent on this issue. Thus, we look to other jurisdictions for guidance.

■ The Supreme Court of Nebraska has addressed the issue whether an amendment to a judgment filed *nunc pro tunc* [5] extended the time within which an appeal could be perfected. *See Interstate Printing Company v. Department of Revenue,* 236 Neb. 110, 459 N.W.2d 519 (1990). Therein, the court stated:

> The general rule is that where a judgment is amended in a material and substantial respect, the time within which an appeal from such determination may be taken begins to run from the date of the amendment, although where the amendment relates only to the correction of a clerical ... error, it does not affect the time allowed for appeal.

*Id.* at 523 (citing, *inter alia, Mulder v. Mendo Wood Products, Inc.,* 225 Cal.App.2d 619,

37 Cal.Rptr. 479, *cert. denied* 379 U.S. 844, 85 S.Ct. 85, 13 L.Ed.2d 50 (1964); *Faddis v. Woodward Iron Company,* 276 Ala. 283, 161 So.2d 486 (1964)). Moreover,

> [i]f the amendment of a final judgment or decree for the purpose of. correcting a "clerical error" either materially alters rights or obligations determined by the prior judgment [or decree] or creates a right of appeal where one did not exist before, the time for appeal should be measured from the entry of the amended judgment. If, however, the amendment has neither of these results, but instead makes changes in the prior judgment which have no adverse effect upon those rights or obligations or the parties' right to. appeal, the entry of the amended judgment will not postpone the time within which an appeal must be taken from the original decree.

*Interstate Printing Co.,* 459 N.W.2d at 522–23 (quoting *Matter of Marriage of Mullinax,* 292 Or. 416, 639 P.2d 628, 637 (Or.1982)). In this case, the ICA's amended order denying reconsideration, which corrected only clerical errors within the original order, is analogous to the trial court's amended judgment in *Interstate Printing. See McCarthy v. Jaress,* 6 Haw.App. 143, 146 n. 5, 711 P.2d 1315, 1319 n. 5 (App.1985) (stating that "[u]nder the HRAP, the date of the filing of the decision, ruling, or opinion is the starting date used in computing the periods for ... seeking certiorari[.]").

■ We believe that the rule in *Interstate Printing* is well-reasoned and adopt it for guidance in situations such as the one before us. Accordingly, in the present case, because the ICA's amended order denying reconsideration corrected only clerical errors and did not materially alter rights or obligations, we hold that the entry of the amended order did not extend the time within. which the SCF was required to file an appli-

---

**4.** HRAP Rule 40 (1999) allows for reconsideration of an appellate disposition.

**5.** "The Latin Phrase, 'nunc pro tunc' is merely descriptive of the inherent power of a court to make its records speak the truth, i .e., to record that which ... actually [occurred]," but was erroneously omitted or recorded. *Simmons v. At-*

*lantic Coast Line Railroad Co.,* 235 F.Supp. 325, 330 (E.D.S.C.1964). Hawai'i courts have the inherent power to amend its records to correspond to the actual facts, *i.e.,* correct a clerical error. *See e.g., City and County of Honolulu v. Caetano,* 30 Haw. 1 (1927); *Wong v. Wong,* 79 Hawai'i 26, 29, 897 P.2d 953, 956 (1995).

cation for certiorari under HRS § 602–59(c) and HRAP Rule 40.1(a). Based on the foregoing, the deadline for the SCF to file its certiorari application was thirty days after the December 2, 1999 filing of the original order denying the motion for reconsideration, or January 3, 2000. Thus, the SCF's application for certiorari, filed on January 5, 2000, was untimely. Consequently, we dismiss the SCF's certiorari proceedings for lack of appellate jurisdiction.

B. *The Presumption*

■■■ Kaiser first contends that the ICA erroneously applied the statutory presumption of compensability to an alleged compensable consequence of a work-related injury. Although we disagree with Kaiser's position, we acknowledge that Hawaii's appellate courts have never determined that the statutory presumption applies in the context of determining the compensability of subsequent injuries alleged to be work-related as a result of a primary compensable injury.[6] Thus, we granted certiorari to explicitly examine the language of HRS § 386–85 to ascertain its proper scope.

Preliminarily, we note that the ICA did not articulate the applicable test for determining the compensability of a subsequent injury that is alleged to be a consequence of a work-related injury. In its opinion, the ICA noted briefly that "injury resulting from treatment for a compensable work injury is regarded as a compensable product of the original injury." *Korsak,* at 260, 12 P.3d at 360 (citing Mod. Work. Comp. § 116:12 (1993)). Although this statement is generally accurate, this court has set forth a specific test for determining whether a subsequent injury is compensable. *See Diaz,* 77 Hawai'i at 155, 883 P.2d at 76 (addressing claimant's compensation claim for the aggravation and treatment of pre-existing compensable neck and back conditions following a subsequent non-industrial automobile accident).

■■■ In *Diaz,* this court stated:

*Generally, a subsequent injury,* whether an aggravation of the original injury or a new and distinct injury, *is compensable if it is the direct and natural result of a compensable primary injury.* ...

Under the "direct and natural result" standard, subsequent injuries that are a direct and natural result of the original injury also arise out of and in the course of employment.... *[T]his court adopts the direct and natural result standard to determine whether compensability should be extended to a subsequent injury.*

*Id.* (internal citations and quotations omitted) (emphases added); *see generally Larson's Worker's Comp. Law,* [hereinafter, Larson's] chapter 10 (2000); Modern Work. Comp. § 116:13–14. Under the test set forth in *Diaz,* the exacerbation of a pre-existing condition that is the "direct and natural result of a compensable primary injury" would be a compensable subsequent injury. *See De-Fries v. Association of Owners, 999 Wilder,* 57 Haw. 296, 308, 555 P.2d 855, 862 (1976) ("Under our workers' compensation statute, the slightest aggravation or acceleration of an injury by the employment activity mandates compensation.") (citing *Akamine v. Hawaiian Packing,* 53 Haw. 406, 410–13, 495 P.2d 1164, 1167–69 (1972)). *See also* Larson's § 10.03. The test for whether a subsequent injury is a "direct and natural consequence" of a compensable injury is:

(1) whether any causal connection exists between the original and subsequent injury; and, if so, (2) whether the cause of the subsequent injury is attributable to some activity that would be customary in light of the claimant's condition.

*Diaz,* 77 Hawai'i at 156, 883 P.2d at 77 (determining that Diaz's subsequent injuries were not the direct and natural result of his work injury because the automobile accident that caused the subsequent injuries was an independent intervening cause, not a "customary" activity). Although the ICA did not articulate the "direct and natural test" set

---

**6.** Although the question whether the presumption of compensability extended to subsequent injuries was raised in *Diaz v. Oahu Sugar Company,* 77 Hawai'i 152, 883 P.2d 73 (1994), this court concluded that, "[b]ecause Diaz had conceded that the accident was not work-related, the statutory presumption of HRS § 386–85(1)[was] not triggered." *Id.* at 157, 883 P.2d at 78. That conclusion, however, is inapposite to the present case, inasmuch as Korsak contends that his subsequent injury is causally connected to his work injury.

forth in *Diaz*, it did indirectly determine that, if Korsak's low back injury resulted form treatment for his knee injury, then it would be a direct and natural consequence of the knee injury.

Having determined that "direct and natural" consequences of a primary work injury are compensable, we must next examine whose burden it is to prove that an alleged subsequent injury is a direct and natural consequence of a work-related injury—the claimant's or the employer's. In other words, does the statutory presumption of compensability apply?

 HRS § 386-85(1) (1993) provides that, *"in any proceeding* for the enforcement of a claim for compensation ... *it shall be presumed ... that the claim is for a covered work injury* [.]"

> The presumption imposes upon the employer the burden of going forward with the evidence and the burden of persuasion. The employer may overcome the presumption only with substantial evidence that the injury is unrelated to the employment. Evidence, to be substantial, must be credible and relevant.

*Tate v. GTE Hawaiian Telephone Co.*, 77 Hawai'i 100, 107, 881 P.2d 1246, 1253 (1994) (internal citations and quotations omitted). Contrary to Kaiser's assertions that the statute applies only to "initial" proceedings or injuries, we construe the use of the word "any" to mean that the presumption applies in all proceedings conducted pursuant to the workers' compensation chapter. *See Hough v. Pacific Ins. Co., Ltd.*, 83 Hawai'i 457, 463, 927 P.2d 858, 864 (1996) ("[I]n interpreting a statute, we give words their common meaning, unless there is something in the statute requiring a different meaning."). It is undisputed that Korsak's claim was filed under the workers' compensation chapter. The purpose of the proceeding before the LIRAB was to determine the compensability of Korsak's subsequent injury claim. Thus, by the plain language of the statute, the presumption applies.

 Our application of the presumption to compensable consequences is consistent with the purpose of the presumption. HRS § 386-85(1) provides that, in any claim for compensation under chapter 386, "it shall be presumed ... that the claim is for a covered work injury." Kaiser correctly points out that the presumption applies to the *"work-relatedness"* of an injury. As stated in *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 636 P.2d 721 (1981), "HRS § 386-85(1) creates a presumption in favor of the claimant that the subject injury is *causally related* to the employment activity...." *Id.* at 650, 636 P.2d at 726-27 (emphasis added).

> The statute nowhere requires ... some preliminary showing that the injury occurred "in the course of employment" before the presumption will be triggered. Rather HRS § 385-86 clearly dictates that coverage will be presumed at the outset, subject to being rebutted by substantial evidence to the contrary. *This is so in all claims proceedings,* ... as the legislature has determined that[,] where there is a reasonable doubt as to whether an injury is work-connected, it must be resolved in favor of the claimant. *Akamine,* 53 Haw. at 409, 495 P.2d at 1166.

*Id.* at 650-51, 636 P.2d at 726-27 (adopting the "work-connection" approach to determining compensability because it more "fairly carries out the purposes of Hawaii's workers' compensation laws") (emphasis added).

 In the context of subsequent injuries, the question of "work-relatedness" is precisely the focus of the inquiry. Specifically, the LIRAB must determine whether the subsequent injury is causally related to the primary injury. Because work-relatedness is the issue in determining compensability of subsequent injuries, the presumption is applicable.

The application of the presumption to all claims for workers' compensation is consistent with the overall legislative design of the workers' compensation laws. As noted by the ICA in *Survivors of Iida v. Oriental Imports, Inc.*, 84 Hawai'i 390, 935 P.2d 105 (App.1997), this court has repeatedly emphasized the remedial nature of the workers' compensation statutes.

> [A large] number of cases have recognized that our workers' compensation statute has a beneficent purpose and should be afforded "liberal construction in favor of the employee, to fulfill the humanitarian pur-

poses for which it was enacted." *Respicio v. Waialua Sugar Co.,* 67 Haw. 16, 18, 675 P.2d 770, 772 (1984). Indeed, since the supreme court's first look at Hawaii's then new workers' compensation statute in 1916, analyses in these kinds of cases have been grounded on the humanitarian purposes premise. *See, e.g., Lawhead v. United Air Lines,* 59 Haw. 551, 559–60, 584 P.2d 119, 124–25 (1978); *DeFries v. [Association] of Owners,* 57 Haw. 296, 303–04, 555 P.2d 855, 860 (1976); *Ichijiro Ikoma v. Oahu Sugar Co.,* 23 Haw. 291, 295–96 (1916).

*Id.* at 397, 935 P.2d at 112; *see also Bocalbos v. Kapiolani Medical Center for Women and Children,* 93 Hawai'i 116, 132, 997 P.2d 42, 58 (App.2000); *Amantiad v. Odum,* 90 Hawai'i 152, 161, 977 P.2d 160, 169 (1999); *Potter v. Hawaii Newspaper Agency,* 89 Hawai'i 411, 423, 974 P.2d 51, 64 (1999); *Ostrowski v. Wasa Elec. Services,* 87 Hawai'i 492, 496, 960 P.2d 162, 166 (App.1998); *Mitchell v. State Dept. of Education,* 85 Hawai'i 250, 255, 942 P.2d 514, 519 (1997); *Alvarez v. Liberty House, Inc.,* 85 Hawai'i 275, 278, 942 P.2d 539, 542 (1997).

█ Accordingly, we hold that, in any proceeding on a claim for compensation due to an alleged compensable consequence of a work-related injury, HRS § 386–85 creates a presumption in favor of the claimant that the subsequent injury is causally related to the primary injury.

We are aware, as Kaiser points out, that Hawaii's workers' compensation presumption places a heavy burden on the employer to disprove that an injury is work-related. In most other jurisdictions, the burden is placed on the employee. *See generally,* Larson's § 80.33(a) (explaining the general rule that the "claimants must establish the work-connection of their injuries, the causal relationship between a work-connected injury and their disabilities, . . . and all other facets of their claims") (footnote omitted). In Hawai'i, however, the legislature has chosen to

cast a heavy burden on the employer in work[ers'] compensation cases. In its wisdom in formulating public policy in this area of the law, the legislature has decided that work injuries are among the costs of production which industry is required to bear; and if there is reasonable doubt as to whether an injury is work-connected, the humanitarian nature of the statute demands that doubt be resolved in favor of the claimant.

*Akamine,* 53 Haw. at 409, 495 P.2d at 1166. It is the legislature's prerogative to give the employee the benefit of the doubt in *any* workers' compensation claim. HRS § 386–85 does just that. Moreover, any argument that the breadth of the statute is overly harsh on employers should be addressed to the legislature and not to the courts.

Accordingly, notwithstanding the ICA's failure to reference the "direct and natural" test articulated in *Diaz* or to explain and clarify its application of the presumption to compensable consequences of primary injuries, we hold that the ICA correctly applied the presumption to the compensable consequence alleged in this case.

### C. Substantial Evidence

█ Kaiser next contends that the ICA misapprehended the nature of the substantial evidence necessary to overcome a claim of compensability. We disagree. "The statute is not a mere procedural device that disappears upon the introduction of contrary evidence." *Akamine,* 53 Haw. at 408, 495 P.2d at 1166. As previously discussed:

HRS § 386–85(1) creates a presumption in favor of the claimant *that the subject injury is causally related to the employment activity.* . . . [T]his presumption imposes upon the employer both the heavy burden of persuasion and the burden of going forward with the evidence. *Akamine,* 53 Haw. at 408, 495 P.2d at 1166. The claimant must prevail if the employer fails to adduce substantial evidence that the injury is unrelated to employment. The term "substantial evidence" signifies a high quantum of evidence which, at the minimum, must be *"relevant and credible evidence of a quality and quantity sufficient to justify a conclusion* by a reasonable man that an injury or death is not work connected." *Id.* at 408–09, 495 P.2d at 1166; *Survivors of Timothy Freitas v.*

*Pacific Contractors, Co.,* 1 Haw.App. 77, 85, 613 P.2d 927, 933 (1980).

*Chung,* 63 Haw. at 650, 636 P.2d at 726.

 Regarding the evidence in this case, the ICA stated that the doctors' reports that were relied upon gave only generalized medical opinions regarding the cause of Korsak's low back pain and concluded that the evidence was, therefore, not substantial. We agree that, pursuant to *Akamine,* generalized medical opinions do not constitute substantial evidence. *See Akamine,* 53 Haw. at 410, 495 P.2d at 1167–68 (noting the distinction between medical causation—e.g., the etiology of a disease—and legal causation). Moreover, we stress the ICA's conclusion that the focus of the medical reports, if they were to be considered adequate in rebuttal, "should have been whether the March 1993 physical therapy session in any way exacerbated Korsak's existing low back condition." *Korsak,* at 258, 12 P.3d at 358. Notwithstanding that conclusion, the ICA also stated:

> The doctor's reports did not expressly, directly and specifically *address* the presumption, as required by *Akamine.* The doctors' opinions did not even impliedly address the presumption.

*Korsak,* at 261, 12 P.3d at 361(emphasis added). *Akamine,* however, does not stand for, and we do not uphold, the proposition that medical opinions must address or rebut the legal presumption imposed by statute. Although a medical expert is competent to give an opinion as to the medical causation of an injury, a medical expert is not competent to opine as to the legal causation of an injury. *See Akamine,* 53 Haw. at 410–11, 495 P.2d at 1167–68. The ICA's aforementioned statement, therefore, is an inaccurate statement of law. Nevertheless, the statement, read in context, as well as the opinion as a whole, clearly demonstrates that the ICA viewed the doctors' reports as *failing* expressly, directly, and specifically to *rebut* the presumption because the reports did not *address* whether Korsak's existing low back condition could have, in any way, been exacerbated in the March 1993 PT session. Thus, by implication, the ICA applied the correct analysis. Accordingly, because the *medical opinions in* this case focused on whether the 1992 fall caused Korsak's low back condition, and did not focus on whether the PT session could have exacerbated Korsak's condition, we hold that the ICA did not err in concluding that the contents of the medical opinions were insufficient to rebut the presumption of compensability.

 Kaiser also contends that substantial evidence was adduced that proved Korsak did not injure his back during a physical therapy session. On the contrary, the LIRAB found that *"there [was] a factual dispute* [ [7] ] on the issue of whether [Korsak] exacerbated his low back during PT for his right knee."* (Emphasis added.) As noted by the ICA, the LIRAB then determined that, *"even if [there were a PT incident* ],"* Korsak's low back condition was due to preexisting causes. (Emphasis added.) Giving due deference to the LIRAB's expertise in weighing the credibility of the evidence, *see Dole Hawaii Div.—Castle & Cooke v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990), the foregoing indicates, at most, that the LIRAB found the evidence regarding the PT session to be conflicting. As stated previously, under our workers' compensation statute, any "doubts [must] be resolved in favor of the claimant." *Akamine,* 53 Haw. at 409, 495

---

**7.** Although apparently not relied upon by the LIRAB, both Drs. Silver and Langworthy noted that the MRIs of the lumbar spine taken on August 3, 1993 did not indicate a change from MRIs taken prior to November 16, 1992. However, because neither doctor addressed whether Korsak could have exacerbated his back in the PT incident, neither opined as to whether Korsak's claimed low back injury should have been visible on an MRI. Furthermore, as noted in the December 22, 1995 decision of the Director of DLIR, "[Korsak] explained that an MRI shows only structural composition, and does not show any soft tissue problems which are responsible for his sciatica."

Additionally, Kaiser points to a letter from the physical therapist, accompanying his notes, to demonstrate that the PT session never occurred. The letter clearly stated that it was addressing only the notes in the record provided by Kaiser; the physical therapist did not state that the sessions reported were the only sessions that occurred. Kaiser did not call the physical therapist to testify at the hearing. Korsak, on the other hand, alleged that the physical therapist was aware of the sciatica he experienced at the PT session in early March 1993, that the physical therapist's letter only addressed the progress notes that he received from Kaiser, and that the record of the March PT session was missing.

P.2d at 1166; *see also Chung* 63 Haw. at 652, 636 P.2d at 727 (determining that where evidence directly conflicts, "the legislature has decided that the conflict should be resolved in claimants' favor"). In the absence of substantial evidence that the injury is unrelated to the employment, the claimant must prevail. *See Chung*, 63 Haw. at 650, 636 P.2d at 726–27.

Therefore, presuming that Korsak developed right sciatica while performing PT for his right knee and considering the whole of Kaiser's evidence to the contrary, there was insufficient relevant and credible evidence to justify the LIRAB's conclusion that the PT session neither aggravated nor exacerbated Korsak's low back condition. Because Kaiser failed to produce substantial evidence that expressly, directly, and specifically rebutted Korsak's claimed injury, the LIRAB erred in concluding that Korsak's low back injury was not a compensable consequence. Accordingly, the ICA did not err in determining as much.

## IV. CONCLUSION

Based on the foregoing, we hold that this court lacks jurisdiction over the SCF's petition for writ of certiorari. We, therefore, dismiss the SCF's certiorari proceedings for want of appellate jurisdiction. Additionally, we affirm the ICA's reversal of the decision and order of the LIRAB and remand for determination of compensation and apportionment, if any, for Korsak's current low back condition.

