**\*\*\* FOR PUBLICATION IN WEST'S HAWAI‘I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-14-0000594
30-JUN-2020
08:12 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

_____

JAY D. CADIZ,
Petitioner/Claimant-Appellant,

vs.

QSI, INC.,
Respondent/Employer-Appellee,

and

FIRST INSURANCE COMPANY OF HAWAI‘I, LTD.,
Respondent/Insurance Carrier-Appellee.

_____

SCWC-14-0000594

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(SCWC-14-0000594; CAAP-14-0000594; AB 2012-099 (2-10-46361)
AND SCWC-16-0000029; CAAP-16-0000029; AB 2013-250 (2-11-46922))

JUNE 30, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

## I.   INTRODUCTION

This case concerns a workers' compensation claim by an

employee for an injury-by-disease stemming from his exposure to

pervasive mold in his work environment over a four-year period and the subsequent breakdown of his health. The employee, Jay D. Cadiz ("Cadiz"), worked different jobs at various Times Supermarket stores in different locations on Oʻahu for several years. Cadiz then transferred to Times Supermarket in Kāneʻohe, owned by QSI, Inc. ("employer"),[1] where he worked for four years in the meat department as a "meatcutter." Prior to working at the Kāneʻohe store, Cadiz was healthy and exercising daily, including engaging in martial arts. Shortly after moving to the Kāneʻohe store in 2004, he "began to feel sick all the time."

Cadiz filed a workers' compensation claim for injury-by-disease, and the Labor and Industrial Relations Appeals Board ("LIRAB") rejected Cadiz's claim,[2] concluding that the employer's reports based on three Independent Medical Examinations ("IME") provided sufficient substantial evidence to overcome the statutory presumption in favor of compensability. See Hawaiʻi Revised Statutes ("HRS") § 386-85(1)(1984) ("In any proceeding for the enforcement of a claim for compensation . . . it shall be presumed, in the absence of substantial evidence to the contrary: (1) That the claim is for a covered work injury[.]")

_____

[1] For ease of reference, QSI, Inc.'s insurance carrier, First Insurance Company of Hawaii, Ltd., also a party, is included in our use of the term "employer."

[2] This brief summary simplifies and condenses a more complicated and extended process. See section II below for a more detailed and accurate account.

"When determining whether a worker's compensation claim is work-related, it is well established in Hawai'i that 'it shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim is for a covered work injury[.]' HRS § 386-85 (1993)." Panoke v. Reef Dev. of Hawaii, Inc., 136 Hawai'i 448, 461, 363 P.3d 296, 309 (2015). The presumption that a worker's claimed injury is "work-connected" and therefore compensable is one of "the 'keystone principles' of our workers' compensation plan." Flor v. Holguin, 94 Hawai'i 70, 79, 9 P.3d 382, 391 (2000). That presumption is paramount, in part, because the workers' compensation statute "provides an injured employee's exclusive remedy for an injury arising out of and in the course of employment." Ihara v. State Dep't of Land & Nat. Res., 141 Hawai'i 36, 42, 404 P.3d 302, 308 (2017) (internal quotation marks and citation omitted). To rebut the presumption, the employer has the burden of going forward with the evidence, which is the burden of production, as well as the burden of persuasion; the burden of production means that the employer must initially introduce substantial evidence that, if true, could rebut the presumption that the injury is work-related. Panoke, 136 Hawai'i at 461, 363 P.3d at 309. The burden of production means that the employer must initially introduce substantial evidence that, if true, could rebut the presumption that the injury is work-related. Id.; see also,

3

Korsak v. Hawaii Permanente Med. Grp., 94 Hawai'i 297, 307, 12 P.3d 1238, 1248 (2000) ("Hawaii's workers' compensation presumption places a heavy burden on the employer to disprove that an injury is work-related. . . . HRS § 386-85(1) creates a presumption in favor of the claimant that the subject injury is causally related to the employment activity." (citation omitted, first emphasis added)). Substantial evidence is relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable person that an injury or death is not work-connected. Panoke 136 Hawai'i at 469, 363 P.3d at 317.

If the employer meets the burden of production, the burden of persuasion requires that the trier of fact weigh the evidence elicited by the employer against the evidence elicited by the claimant. Id. In evaluating whether the burden of persuasion has been met in the workers' compensation context, "the broad humanitarian purpose of the workers' compensation statute read as a whole requires that all reasonable doubts be resolved in favor of the claimant." Van Ness v. State Dep't of Educ., 131 Hawai'i 545, 558, 319 P.3d 464, 477 (2014)(citations, internal quotation marks, and brackets omitted).

For the reasons detailed more fully below, we hold the employer's IME reports failed to provide substantial evidence to meet its burden to produce evidence that, if true, would

4

overcome the statutory presumption that the injury is work-related.  As the employer failed to meet its burden of production, we do not reach the issue of whether the employer met its burden of persuasion.  Panoke at 462, 363 P.3d at 310.

Cadiz presented laboratory evidence of elevated levels of dangerous mycotoxins in his body.  That evidence was never rebutted by the employer's IME reports.  Indeed, the employer's IME reports never addressed the scientific evidence of elevated levels of mycotoxins in Cadiz's body in relation to the presumption in favor of compensability.  In addition, although the LIRAB's decision and order included the boilerplate language that "all reasonable doubts have been resolved in favor of Claimant," in fact, the LIRAB failed to do so.

Based on the laboratory evidence confirming elevated levels of harmful mycotoxins in Cadiz's body, and based on the employer's failure to meet its burden of production, we conclude that the employer failed to overcome the presumption in favor of compensability.  Accordingly, we vacate the ICA's judgment on appeal and its Summary Disposition Order ("SDO"), and we vacate the LIRAB's decision and order in case number AB 2012-099 (2-10-46361) (Cadiz I).[3]  We remand to the LIRAB with the instruction

---

[3]     As our background section below narrates, this case was the subject of two different full de novo hearings before the LIRAB, which we designate Cadiz I and Cadiz II.  In the first, for procedural reasons, Cadiz was not allowed to present the live testimony of his expert, Dr. Janette

(. . . continued)

that Cadiz's injury-by-disease is compensable under Hawai'i's workers' compensation law and for proceedings consistent with this opinion.

## II. BACKGROUND

After working different jobs at various Times Supermarket stores in different locations for several years, Jay Cadiz transferred to the Times Supermarket in Kāne'ohe. He worked for four years in the Kāne'ohe meat department as a meatcutter, working eight hours a day, five days a week, with approximately five hours of overtime per week. According to Cadiz, prior to working at the Kāne'ohe store, he was healthy and exercising daily. He engaged in martial arts. Shortly after moving to the Kāne'ohe store in approximately June 2004, he "began to feel sick all the time." The Kāne'ohe store, he said, "was the first dirty store I worked in: molds all over the walls, ceilings, lots of drain[s] with molds, caved in ceilings, crack[s] in ceilings."

_____
(continued. . . )

Hope, on the various adverse health-related effects of mycotoxin exposure and inhalation. In the second, Dr. Hope gave extensive live testimony, but the LIRAB disregarded that testimony for procedural reasons.

As noted, we base our holding on the laboratory evidence confirming elevated levels of harmful mycotoxins in Cadiz's body presented in Cadiz I (albeit in abbreviated form), and we base it, as well, on the requirement in Hawai'i's workers' compensation law that all reasonable doubts must be resolved in favor of the claimant. Because our holding rests on those bases, it is unnecessary to address the merits of the LIRAB's procedural determinations in Cadiz II.

According to Cadiz, the mold covered "all the fans, the AC fans, the left side wall was just covered in black mold and the right side of the wall, near the cutting table, it was just black; like pitch black mold just eating up the walls and ceiling," as well as the storage room. The ceiling of the meat department was always wet. Twice, the ceiling fell into the meat department when it rained. The first time the ceiling fell was in early August 2004, a few months after he began working at the Kāne'ohe store.

After a few months of working in this environment, Cadiz began experiencing "breathing problems, asthma attacks, sinus infections, and debilitating headaches," as well as dizziness and vertigo. Four of the other workers in the meat department at the time also complained of breathing difficulties and other ailments. Beginning in 2007, Cadiz took extensive leaves for illness, and he finally resigned from his job as a meatcutter towards the end of 2008.

For the five years prior to working at the Kāne'ohe Times store, Cadiz averaged eight visits to a doctor or emergency room per year, including visits relating to a concussion he received while performing martial arts. While working in the meat department, he saw a physician or received emergency treatment on average of twenty-six times per year. From August 31, 2007, when he experienced heart palpitations,

through the end of 2007, Cadiz sought treatment from medical personnel or social workers forty-three times.

Cadiz brought an initial claim for workers' compensation in September 2010. In the space on the claim form reserved for a response to "describe how accident occurred," he indicated that the accident occurred when he was working at the Kāne'ohe Times Supermarket and was "exposed to black mold" over four years in his work at the meat department. In the space on the claim form reserved for a response to "describe injury/illness," he responded: "Headaches, dizziness, respiratory problems, memory problems, vision, skin problems, anxiety." Cadiz brought an "amended claim" for workers' compensation benefits in November 2011, based largely on the same set of facts but this time claiming "exposure to mold" generally, and alleging "additional injuries." The description of the illness in the amended claim expanded to "headaches, respiratory illnesses, cognitive impairment, psychological injury, chronic rhinitis/sinusitis, vertigo, tinnitus, palpitations, sleep disturbance, myalgia, GERD, gastritis, urinary frequency, dysuria, malaise, fatigue."

In October 2011, Dr. Myles Suehiro ordered a urine test from RealTime Laboratories on behalf of Cadiz in order to detect the presence of any mycotoxins in Cadiz's body. Cadiz tested positive for elevated levels of two mycotoxins;

ochratoxin and trichothecene.  Mycotoxins are toxins generated by molds or fungi.  According to a RealTime Laboratories article cited by both parties:

> The negative health effects of mycotoxins are a function of the concentration, the duration of exposure and the individual's sensitivities.  The concentrations experienced in a normal home, office, or school are often too low to trigger a health response in occupants.  However, concentrations experienced in a home or building which has experienced water leaks are often high enough to trigger health responses in the occupants.

Trichothecenes are mycotoxins generated by different fungi, including Stachybotrys chartarum ("Stachybotrys").  According to the same source, "[t]heir mechanism of action is the inhibition of protein synthesis, therefore they are known to kill cells and are extremely dangerous."  In addition, "when Stachybotrys grows in a mold infested building, the organism produces trichothecene mycotoxins.  It is also known that these toxins can get into the air where they can be inhaled."  Different variations of trichothecene mycotoxins "are strongly toxic compounds."

Pursuant to HRS § 386-79 (1996), the employer designated and paid two physicians and one psychologist to examine Cadiz and produce independent medical examinations.[4]

---

[4]  In the workers' compensation context, the word "independent," in the phrase "independent medical examination," can be something of a misnomer. A physician who performs an "independent medical examination" has been selected by the employer and paid for by the employer.  HRS § 386-79(a) ("After an injury and during the period of disability, the employee, whenever ordered by the director of labor and industrial relations, shall submit to examination, at reasonable times and places, by a duly qualified physician or surgeon designated and paid by the employer.")  The examining physician is

(. . . continued)

Cadiz was examined by Dr. Leonard Cupo on January 11, 2011. Dr. Cupo produced an IME on November 12, 2011. Cadiz was examined by psychologist Dr. Roger Likewise on January 10, 2011. Dr. Likewise produced an independent psychological examination (referred to below for convenience as an IME) on November 18, 2011.

Finally, Cadiz was examined by Dr. Ajit Arora for one and a half hours on October 29, 2012. Only three days later, Dr. Arora produced a 407-page, single-spaced IME report, including appendices and synopses of articles in the medical and toxicological literature. Appendix B, for example, ran from page 360 to 385 of Dr. Arora's report. It included a list of the titles of 51 articles dealing with mold and related health issues in humans. The most recent of those articles was from 2002, 10 years prior to the IME. Appendix B also included abstracts of various articles relating to mold, mycotoxins, and toxicology, none more recent than 2002. Appendix B also included various excerpts from the American College of Occupational Environmental Medicine ("ACOEM") relating to toxic

_____
(continued. . . )

"independent" in the sense that she cannot be the claimant's personal physician, and the examination is "independent" in the sense that no physician-patient relationship is created between the physician-examiner and the employee as a result of the examination. See 61 Am. Jur. 2d <u>Physicians, Surgeons, Etc.</u> § 273 ("When an employer retains a physician to examine its employees, generally, no physician-patient relationship exists between the employee and the doctor[.]")

mold, including excerpts concerning a particularly dangerous toxic mold whose scientific name is Stachybotrys. The excerpts from the ACOEM are also from 2002.

Dr. Cupo's IME report itemized 16 of Cadiz's symptoms under the heading "Diagnoses." For each symptom, Dr. Cupo wrote the same refrain, repeated 16 times: X symptom was "not caused, aggravated, or accelerated by job activities as a meat cutter for Times Supermarket." According to Dr. Cupo, Cadiz had not tested positive for an allergy to mold but had tested positive for an allergy to dust mites. Thus, Cadiz's rhinosinusitis, chronic headaches, recurrent shortness of breath, etc., all were "medically plausibly explainable by other medical conditions" without needing to resort to toxic mold exposure.

According to Dr. Likewise, Cadiz suffered from "hypochondriacal preoccupations," chronic somatization, generalized anxiety disorder, or chronic panic attacks, and dependent personality disorder. Dr. Likewise does not appear to have offered any suggestion as to which of Cadiz's multiple symptoms were psychosomatic and which were not. Rather, his report gives the impression that, apart from allergies, they all might be psychosomatic.

According to Dr. Arora, Cadiz's headaches, dizziness, nausea, chronic rhinitis, sinusitis, and asthma could be "explained by chronic anxiety and panic disorder" through the

mechanism of "hyperventilation." On the subject of mold, Dr. Arora opined that the

> black mold of concern has been <u>Stachybotrys chartarum</u>, which does not grow on walls and ceilings. It is a fastidious mold that only grows above the ceilings in dark and on wooden beams in attics. The black mold that grows in the lighted areas on walls or ceilings is <u>Cladosporium</u>, which is a relatively benign mold, causing only allergies.

Dr. Arora opined that spore counts are the proper measure of mold toxicity. According to him, if the meat department at Times "was the worst building ever described in the United States, then one would not anticipate more than 1700 spores of Stachybotrys per cubic meter. That will not be sufficient to cause toxicity from inhalation."

Materials included in Dr. Arora's IME report included an abstract of an article stating that in one study, "evidence was found of a relationship between high levels of inhalation exposure or direct contact to mycotoxin-containing molds or mycotoxins and demonstrable . . . health effects in humans[.]" Nonetheless, according to the abstract, the then-current literature (2002) did not provide "compelling evidence that exposure at levels expected in most mold-contaminated indoor environments is likely to result in measurable health effects." Still, the abstract from the article cautioned that "the point at which mold contamination becomes a threat to health <u>is unknown</u>." (Emphasis added.)

In Appendix B to his IME report, Dr. Arora himself testified to the adverse health consequences of mycotoxins. He wrote, for example, of the "[t]oxic effects from mycotoxins produced by certain fungal species. This may include disruption of cellular function, alteration of immune competence, and cytotoxic effects with DNA damage and mutations resulting in cancer such as with aflatoxins." In addition, Dr. Arora wrote that "exposure to mycotoxins at toxic levels can cause illness . . . in humans and animals." Finally, Dr. Arora characterized trichothecenes, one of the mycotoxins verified by laboratory results to be present at elevated levels in Cadiz's body: "Trichothecenes are the most widely studied mycotoxins. . . . Trichothecenes are potent inhibitors of protein synthesis in eukaryotic cells, particularly in rapidly proliferating tissues. This property has led to their use as biological weapons." Other than these relatively generic mentions of trichothecenes in Appendix B of his IME report, Dr. Arora never specifically discusses trichothecenes in relation to Cadiz. That is, in his IME report, Dr. Arora never discusses the laboratory results proving that Cadiz had elevated levels of trichothecenes in his body.[5]

---

[5] Appendix B to Dr. Arora's IME report appears to be from a presentation Arora made to a different audience at some point prior to the IME. One indication of this is that there is no mention of Cadiz in Appendix B (other than in the "Re:" line at the top of each page).

### A. Proceedings before the Director and the LIRAB in <u>Cadiz I</u> (LIRAB Case No. AB 2012-099)

Cadiz's September 3, 2010 claim for injury-by-disease was the subject of a hearing before the director on December 1, 2011. The director ruled that the claim was not time-barred but nevertheless denied the claim for compensation on the basis that the record revealed "an absence of empirical evidence confirming that claimant's worksite contained black mold." The director concluded that "claimant's claimed injury was not the result of exposure to purported black mold at work," and therefore concluded that Cadiz "did not suffer an injury on 8/31/2007 arising out of and in the course of his employment." Cadiz appealed the director's decision to the LIRAB for a full de novo hearing on his claim. See HRS § 386-87(b) ("The appellate board shall hold a full hearing de novo on the appeal.").

Prior to the de novo hearing, the Board refused to allow Dr. Janette Hope to give live testimony because Cadiz's attorney had not named her as a live witness by the relevant deadlines in the Board's pre-trial order. The Board excluded Dr. Hope's detailed declaration apparently for the same reason. The only evidence from Dr. Hope allowed by the Board appears to have been her two-page opinion letter dated November 16, 2011. In that letter, after having reviewed medical records and symptom summaries concerning Cadiz, Dr. Hope observed that "Mr.

Cadiz experienced a marked decline in his health starting in 2007 resulting in numerous physician, specialist and urgent care visits for a multitude of symptoms which are most likely attributable to his exposure to a severely water damaged/moldy workplace."  She connected this assessment of the "likely" cause of his varied symptoms with the laboratory results of his mycotoxin exposure.  "Mr. Cadiz shows elevations in ochratoxin and trichothecene mycotoxins on urine mycotoxin testing which likely resulted from his exposure to a severely water damaged/moldy workplace and contributed to his numerous health complaints including respiratory, gastro-intestinal, urologic and immune system complaints."  She stated that, "In addition, he shows evidence of immune system dysfunction as well as abnormalities on pulmonary function testing consistent with his exposure."

The hearing was held on June 14, 2013 and June 17, 2013, and the Board issued its decision and order on March 10, 2014.  In its decision and order, the Board made extensive findings of fact.  The Board found, inter alia, that Cadiz had presented evidence "that mold was present in the area of Claimant's work environment during the period in question" and that Cadiz was exposed to the mold.  The Board found that Cadiz does not have an allergy to Stachybotrys, the black mold that according to Dr. Arora is "of concern," but Cadiz was allergic

to dust mites.  In addition, the Board found that the Mycotoxin Panel Report documented the presence of ochratoxin and trichothecene in Cadiz's body.

The Board made various findings of fact concerning Cadiz's multiple symptoms, including recitations of the conclusions of Drs. Cupo, Arora, and Likewise.  The Board's recitations of the employer's IME reports centered on the fact that they had provided possible alternative explanations for Cadiz's symptoms that were not mold-related and therefore were evidence that his injury-by-disease was not work-connected.  In Dr. Cupo's words, Cadiz's "symptoms were easily and medically plausibly explainable by other medical conditions" without the need to resort to explanations based on exposure to mold.

On the issue of the compensability of Cadiz's illnesses, the Board stated that it would apply the unitary test as then-recently articulated by Van Ness, 131 Hawai'i at 560, 319 P.3d at 476.  The Board started with the presumption in favor of compensability, but it determined that the employer had presented substantial evidence to rebut that presumption.  Once over the hurdle of the presumption, the Board "weighed the evidence by Employer against that presented by Claimant" on the evidence relating to causation.

The Board found the "medical opinions" presented by Dr. Hope and another doctor on behalf of Cadiz "severely lacking

in quality to justify their conclusions," stating that Dr. Hope and the other doctor "appeared to accept Claimant's hypothesis with only cursory medical data." In contrast, the Board found Drs. Cupo, Likewise, and Arora to have "provided a sufficient degree of specificity to rebut the presumption of compensability." The Board credited their opinions, and accordingly concluded that Cadiz did not sustain a personal injury arising out of and in the course of employment.

The Board made no findings or conclusions on what exactly it found persuasive in the evidence provided by Drs. Cupo, Likewise, and Arora, other than to suggest that they had examined and treated Cadiz, whereas there was no indication of "what medical data" Dr. Hope had relied on "to form an opinion regarding causation" of Cadiz's condition. The Board made no findings or conclusions concerning what, if any, doubts it resolved in favor of the claimant. The Board made no findings or conclusions on the elevated levels of mycotoxins verified to have been absorbed by Cadiz's body, other than to note the bare results of the laboratory test. The Board made no findings or conclusions on whether or how the employer's IME reports disproved the work-connection between Cadiz's illnesses and the pervasive mold in the meat department.[6] The Board appears to

---

[6] The Board found as fact that the employer failed to present "any evidence that contradicts the presence of the alleged black mold at the

(. . . continued)

have simply accepted the IME reports' suggestion that other medical causes could "medically plausibly" explain Cadiz's illnesses and then concluded that the work-connection issue therefore tipped towards the employer.

**B. Proceedings before the Director and the LIRAB in <u>Cadiz II</u> (LIRAB Case No. AB 2013-250) in which Dr. Hope provided live testimony previously excluded by the Board**

Cadiz's November 15, 2011 claim for injury-by-disease was the subject of a hearing before the director on April 30, 2013 (<u>Cadiz II</u>). The director ruled on June 27, 2013, that the claim was an attempt to circumvent the director's prior decision for the same injury. On July 11, 2013, Cadiz appealed the director's decision in <u>Cadiz II</u> to the LIRAB for a full de novo hearing on his claim. The LIRAB issued a pre-trial order on January 31, 2014, stating that the "sole issue to be determined is whether Claimant sustained a personal injury on November 14, 2011, arising out of and in the course of employment." The full de novo evidentiary hearing before the Board was held on August 26, August 27, and September 26, 2014. In <u>Cadiz II</u>, Dr. Hope's detailed declaration concerning mycotoxin exposure through mold inhalation and resulting ill-health, along with its multiple

_____

(continued. . . )

workplace" and that "mold was present in the area of Claimant's work environment during the period in question." In addition, the Board further found "that Claimant was exposed to such mold."

exhibits, was admitted. In addition, Dr. Hope provided extensive live testimony.

Having heard and admitted this testimony by Dr. Hope into the record, the Board's resulting order and decision in Cadiz II made no findings or conclusions with respect to Dr. Hope's extensive testimony. The decision and order in Cadiz II simply vacated the underlying decision of the director in Cadiz II, effectively terminating the proceedings, without remanding to the director for any further findings or conclusions concerning the newly admitted testimony of Dr. Hope. In other words, in spite of its pretrial order governing the scope of the Cadiz II hearing—the order stating that "the sole issue to be determined on this appeal is whether Claimant sustained a personal injury on November 14, 2011, arising out of and in the course of employment"—the Board made no findings or conclusions on the testimony admitted into evidence concerning the sole issue on appeal to the Board in Cadiz II. Instead of rendering a decision as to whether Cadiz sustained an injury-by-disease that was work-connected, or interpreting the newly-admitted testimony of Dr. Hope in light of that question, the Board concluded that in Cadiz I, it had rejected Cadiz's initial claim for work-related injury of September 3, 2010 as time-barred and had instead based its order and decision in Cadiz I on the November 21, 2011 claim.

19

Thus, the Board in Cadiz II decided that it had already addressed the same claim in Cadiz I, concluding that "the November 21, 2011 claim was not a new or subsequent claim for compensation, but an amended claim for an industrial injury by disease that was before the Director and decided by the Board in Cadiz I[.]"  However, rather than take into account the significant newly-admitted testimony of Dr. Hope bearing directly on the work-connectedness of Cadiz's injury-by-disease claim, the Board ignored Dr. Hope's extensive testimony.  That is to say, the Board's decision and order in Cadiz II never mentions Dr. Hope's extensive testimony, admitted into the record in Cadiz II, concerning (a) the nature and harmfulness of exposure to mycotoxins, (b) the sometimes complex array of symptoms that can be generated by exposure to mycotoxins, or (c) the fact that Cadiz's multiple symptoms match what she has repeatedly seen in her treatment of patients exposed to mycotoxins.

## C. Proceedings before the Intermediate Court of Appeals (ICA)

Cadiz filed a notice of appeal of the Board's decision in Cadiz I with the ICA on March 21, 2014.  Cadiz filed a notice of appeal of the Board's decision in Cadiz II with the ICA on January 20, 2016.  The ICA consolidated the appeals of Cadiz I and Cadiz II on December 15, 2016.  On March 31, 2017, the ICA issued its SDO in the combined appeals.  Cadiz v. QSI, Inc.,

20

Nos. CAAP-14-0000594 and CAAP-16-0000029, 2017 WL 1194168 (App. March 31, 2017) (SDO).

The ICA's SDO affirmed the LIRAB's decision and order dated March 10, 2014 in Cadiz I, which ruled that Cadiz had not sustained an injury arising out of and in the course of employment. The ICA also affirmed the LIRAB's December 22, 2015 decision and order in Cadiz II vacating the director's decision. Cadiz, Id. at *8.

The ICA began by addressing Cadiz's claim that the Board had failed to properly apply the presumption in favor of compensability. The ICA reviewed the relevant law providing that the presumption can only be overcome by the employer producing substantial evidence that the injury-by-disease "is unrelated to employment." Id. at *2 (quoting Akamine v. Hawaiian Packing & Crating Co., 53 Haw. 406, 408, 495 P.2d 1164, 1165 (1972)). The ICA also drew attention to this court's conclusion in Van Ness that the employer had "failed to present substantial evidence to overcome the presumption that the aggravation of [claimant's] asthma was an injury 'by disease proximately caused by' his employment." Id. at *3 (quoting Van Ness, 133 Hawai'i at 565, 319 P.3d at 484).

The ICA next highlighted the conclusions of the IME reports of Dr. Cupo and Dr. Arora. Specifically, the ICA quoted with approval Dr. Cupo's assertion that Cadiz's multiple

21

symptoms were "easily and medically plausibly explainable" by medical conditions other than exposure to toxic mold. Id. It also quoted Dr. Arora's assertion that Stachybotrys does not grow on walls and ceilings, implying that it could not have been the kind of mold conspicuous on the ceiling in the Kāne'ohe meat department. In addition, the ICA found helpful Dr. Arora's assertions regarding the low probability of any toxic effect from inhalation of mycotoxins, given the high spore count that would be required. Id. at *3-4. According to the ICA, "Drs. Cupo and Arora also provided alternative explanations for Claimant's allergic rhinitis, GERD, and anxiety." Id. at *4. The ICA explained that Drs. Cupo and Arora in their reports "explained why mold exposure could not have caused or aggravated Claimant's injuries, and did not provide mere generalized medical opinions." Id. The ICA also dwelled at length on Dr. Likewise's psychological report. Id. at *4-5.

The ICA concluded that the IME reports provided the requisite "substantial evidence" to rebut the presumption of compensability through providing alternative explanations of Cadiz's symptoms and illnesses. In particular, the ICA seemed impressed by the "substantial evidence of a high degree of specificity, quantity, and quality that Claimant did not have a mold allergy and that Claimant's conditions were not otherwise caused by exposure to mold in the workplace." Id. at *5. The

ICA specifically rejected Cadiz's suggestion that the LIRAB erred in crediting Dr. Likewise's opinion.  Id. at \*6.

Cadiz argued to the ICA that the LIRAB in Cadiz I erred in excluding Dr. Hope's declaration, her credentials, and various other materials relating to past professional complaints and administrative actions against Dr. Arora.  Dr. Hope's declaration and other materials excluded from Cadiz I seem to have been excluded by the LIRAB based on Cadiz's failure to meet discovery deadlines.  Cadiz, Id. at \*6-7; (noting that the ICA was "not able to properly review what was presented before the LIRAB [in Cadiz I] as there are no transcripts of the June 14, 2013 and June 17, 2013 hearing in the record.  Nevertheless, upon review of the LIRAB's March 10, 2014 Decision and Order, it appears that the LIRAB excluded Exhibits A-l, B, and FF, because the exhibits were not timely submitted.").⁷  The ICA found that admission or exclusion of evidence is generally in the discretion of the officials conducting an administrative hearing, and the LIRAB properly excluded exhibits and other evidence as untimely.  Id. at \*7.  In addition, the ICA noted that it was "not able to properly review what was presented before the LIRAB" in Cadiz II because the transcripts from that

---

[7]    Exhibit A-1 consisted of Dr. Hope's 5-page declaration; exhibit B was her 6-page curriculum vitae; and exhibit FF consisted of a series of articles critical of Dr. Arora as well as references to various complaints and/or administrative actions against him.

23

hearing were not in the record.  Id. at *8.  Finally, the ICA

affirmed the LIRAB's decision and order in both Cadiz I and

Cadiz II.  Id. at *9.  Cadiz applied for a writ of certiorari,

and we accepted his application.

### III.   STANDARDS OF REVIEW

#### A. Appeals from Agency Determinations Relating to Workers' Compensation

Appellate review of a LIRAB decision is governed by

the provisions of Hawai'i Administrative Procedures Act ("HAPA")

relating to judicial review of agency action.  HRS § 91-

14(g)(1993); Bocalbos v. Kapiolani Med. Ctr. for Women &

Children, 93 Hawai'i 116, 123, 997 P.2d 42, 49 (App. 2000).

Under HAPA's judicial review provisions,

> the reviewing court "may affirm the decision of the agency
> or remand the case with instructions for further
> proceedings."  Id.  The reviewing court also "may reverse
> or modify the decision and order if the substantial rights
> of the petitioners may have been prejudiced because the
> administrative findings, conclusions, decisions, or orders"
> (1) violate provisions of the constitution or a statute,
> (2) are beyond the agency's statutory authority or
> jurisdiction, (3) used "unlawful procedure," (4) were
> "[a]ffected by other error of law," (5) were clearly
> erroneous, or (6) were arbitrary or capricious "or
> characterized by abuse of discretion or clearly unwarranted
> exercise of discretion."  HRS § 91-14(g)(1)-(6).

Ihara, 141 Hawai'i at 41, 404 P.3d at 307.

"The LIRAB's conclusions of law are reviewed de

novo, under the right/wrong standard.  Its findings of fact

'are reviewable under the clearly erroneous standard to

determine if the agency decision was clearly erroneous in

24

view of reliable, probative, and substantial evidence on the whole record.'" Van Ness, 131 Hawai'i at 558, 319 P.3d at 477 (citation omitted). Like any agency findings, the LIRAB's "findings should be 'sufficient to allow the reviewing court to track the steps by which the agency reached its decision.'" Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kauai, 133 Hawai'i 141, 164, 324 P.3d 951, 974 (2014) (citation omitted).

## B. Statutory Interpretation

"Statutory interpretation is a question of law reviewable de novo." Ryan v. Herzog, 142 Hawai'i 278, 284, 418 P.3d 619, 625 (2018) (citation omitted). The Hawai'i workers' compensation statute must be "construed . . . liberally" in order to effect its "beneficent purposes." Puchert v. Agsalud, 67 Haw. 25, 36, 677 P.2d 449, 457 (1984).

## IV. DISCUSSION

We begin with a brief overview of the law governing workers' compensation in Hawai'i and then apply those principles to the decisions below.

## A. Principles Governing Hawai'i Workers' Compensation Law

The Hawai'i workers' compensation statute "is social legislation that is to be interpreted broadly." Davenport v. City & Cty. of Honolulu, Honolulu Fire Dep't, 100 Hawai'i 481,

25

491, 60 P.3d 882, 892 (2002). The provisions of the Hawaiʻi workers' compensation law "are highly remedial in character. Their paramount purpose is to provide compensation for an employee for all work-connected injuries, regardless of questions of negligence and proximate cause." Flor, 94 Hawaiʻi at 79, 9 P.3d at 391 (emphasis added). The overarching policy of workers' compensation in this state is that "an employee should be indemnified for all infirmities resulting from [their] employment." Van Ness, 131 Hawaiʻi at 559, 319 P.3d at 478 (citation omitted); Iddings v. Mee-Lee, 82 Hawaiʻi 1, 5, 919 P.2d 263, 267 (1996) (stating that the workers' compensation statute provides "an injured employee's exclusive remedy for an injury arising out of and in the course of employment."). "Under our workers' compensation statute, the slightest aggravation or acceleration of an injury by the employment activity mandates compensation." Korsak, 94 Hawaiʻi at 305, 12 P.3d at 1246.

The workers' compensation statute rests on the presumption that a claimed injury is work-connected and therefore compensable. HRS § 386-85 (1993) ("In any proceeding for the enforcement of a claim for compensation . . . it shall be presumed, in the absence of substantial evidence to the contrary:  (1) That the claim is for a covered work injury[.]"); Panoke, 136 Hawaiʻi at 461, 363 P.3d at 309 ("When determining

26

whether a workers' compensation claim is work-related, it is well established in Hawai'i that 'it shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim is for a covered work injury[.]"). "The presumption has been described as one of the 'keystone principles' of our workers' compensation plan." Flor, 94 Hawai'i at 79, 9 P.3d at 391 (citation omitted). It is the burden of the employer to produce substantial evidence that, if true, could rebut the presumption that the injury is work-related. Panoke, 136 Hawai'i at 461, 363 P.3d 296 at 309. Once the burden of production is met, the burden of persuasion requires that "the trier of fact . . . weigh the evidence elicited by the employer against the evidence elicited by the claimant." Id. In evaluating whether the burden of persuasion has been met, the "broad humanitarian purpose of the workers' compensation statute read as a whole requires that all reasonable doubts be resolved in favor of the claimant." Ihara, 141 Hawai'i at 41, 404 P.3d at 307 (citation omitted).

Disputes concerning the validity of claims for compensation under Hawai'i's workers' compensation law are initially decided by the director of Labor and Industrial Relations. HRS § 386-86(a)-(b). The director conducts a hearing on the claim and issues findings of fact and conclusions of law. Id. The decision of the director may be

administratively appealed to the LIRAB, which conducts a trial-like hearing on the appeal de novo.  HRS § 386-87(a)-(c).  A LIRAB decision may be appealed directly to the ICA.  HRS § 386-73.5; HRS § 386-88.  Because any appeal from a determination of the director receives a full hearing de novo from the LIRAB, this court reviews only the decisions of the LIRAB and not the decisions of the director.

**B.  The Board and the ICA Erred by Misapplying the Presumption in Favor of Compensability.**

As noted, Hawai'i's workers' compensation law begins with the explicit statutory presumption that a claimed injury is work-related and therefore compensable.  HRS § 386-85(1).  To rebut that presumption in favor of compensability, the employer bears the heavy burden of producing substantial evidence disproving that the injury is work connected.  Korsak, 94 Hawai'i at 307, 12 P.3d at 1248 ("Hawaii's workers' compensation presumption places a heavy burden on the employer to disprove that an injury is work-related. . . .  HRS § 386-85(1) creates a presumption in favor of the claimant that the subject injury is causally related to the employment activity." (citation omitted, first emphasis added)).

Thus, the "substantial evidence" sufficient to overcome the presumption in favor of compensability must disprove the causal relation of the injury-by-disease to the

28

conditions and incidents of claimant's employment, and not merely suggest plausible alternative explanations. "In evaluating whether the burden of producing substantial evidence has been met, 'the slightest aggravation or acceleration of an injury by the employment activity mandates compensation.'" Panoke, 136 Hawai'i at 461, 363 P.3d at 309; see also Van Ness, 131 Hawai'i at 561, 319 P.3d at 480 ("The relevant issue under the unitary or 'work-connection approach' is simply whether there is a causal connection between the injury and any incidents or conditions of employment[.]").

1. **The LIRAB and the ICA failed to produce substantial evidence that, if true, could disprove the presumption of compensability in Cadiz I.**

The presumption in favor of compensability "signals and reflects a strong legislative policy favoring awards in arguable cases." Lawhead v. United Air Lines, 59 Haw. 551, 560, 584 P.2d 119, 125 (1978) (citation omitted). Here, the three IME reports offered by the employer in Cadiz I regarding the claimant's exposure to mycotoxins did not meet the burden of production of showing that Cadiz's injury-by-disease was not work-related. The IME reports (a) arrived at mutually inconsistent results,[8] and (b) failed to mention, much less

---

[8] To mention only a few examples, Dr. Likewise in his IME report asserts "there is no clear medical explanation for [Cadiz's] symptoms," and therefore concludes that many or perhaps all of Cadiz's symptoms were

(. . . continued)

directly address, the laboratory tests that objectively proved the elevated presence of harmful mycotoxins in Cadiz's body.

Cadiz's illnesses and symptoms reasonably appear to be work-connected.  See id., (stating that "an injury is compensable if it reasonably appears to have resulted from the working conditions.").  The verified presence of harmful mycotoxins in Cadiz's body, correlated with the dramatically increased frequency of his visits to the doctor and the emergency room during the relevant period, together with the pervasive moldy conditions of the meat department, make Cadiz's claimed injury-by-disease reasonably appear to be work-connected and therefore compensable.  Id.  The employer did not meet its burden of producing substantial evidence that, if true, could rebut the presumption that Cadiz's injury was work-related.  Moreover, the LIRAB in Cadiz I, and the ICA in reviewing the

_____
(continued. . . )

psychosomatic, hypochondriacal, or due to a personality disorder.  Dr. Cupo, on the other hand, concludes that "chronic allergic rhinosinusitis with sensitivity to dust mites and chronic gastroesophageal reflux disease have been definitively established."  However, Dr. Cupo concludes that Cadiz's "symptoms can in no way be explained by exposure to mold" at Times Supermarket because allergy skin testing of Cadiz "revealed positivity only to dust mites and negativity to molds."  Dr. Cupo's assumption that allergy to mold is the only possible mechanism by which ill-health is related to environmental mold is contradicted by parts of Dr. Arora's IME report.  Dr. Arora's report describes a scientific article which focuses not on allergies to mold as the mechanism for adverse health effects but on "epidemiological studies from the primary literature concerning inhalation of mycotoxins or potentially toxin-producing molds."  The article's review of those studies indicated that "evidence was found of a relationship between high levels of inhalation exposure or direct contact to mycotoxin-containing molds or mycotoxins and demonstrable . . . health effects in humans," although the article does not find the evidence "compelling."

Board's decision and order, exclusively relied on three IME reports that themselves fail to consider or in any way account for the evidence of harmful mycotoxins present in Cadiz's body (admitted into evidence in Cadiz I).[9]  Finally, even if the cause

---

[9]     The Board did find as fact, "A Mycotoxin Panel Report Form dated October 27, 2011 documented the presence of ochratoxin of 4.2 [parts per billion ("ppb")] and trichothecene at 0.39 ppb" in Cadiz's urine.  But the Board did not note that according to the Panel Report, each of those results is twice the level of detection.  In addition, the Board provided no further context in its decision and order for those quantitative levels of mycotoxins.

It is true that the Board in Cadiz I had excluded Dr. Hope's declaration, which provided the relevant medical and toxicological context for the particular levels of those specific mycotoxins in Cadiz's body.  The levels revealed by laboratory testing are "elevated levels."  Any level above the "detection level" represents "the mycotoxin presence in the persons exposed to indoor mold compared to those unexposed"; and "the elevated levels of these mycotoxins" detected in Cadiz "can cause the type of symptoms experienced by Mr. Cadiz such as a burning sensation of the mouth, esophagus and stomach and may also impair brain function . . . .  Both of these toxins can also cause depression of the immune system which could lead to flu-like symptoms such as rhinitis, headache, and dizziness."  However, similar information was provided in Dr. Hope's opinion letter dated November 16, 2011, which was admitted in Cadiz I.  In that letter, after a review of portions of Cadiz's medical history, Dr. Hope opined that Cadiz's

> multiple symptoms. . . are most likely attributable to his exposure to a severely water damaged/moldy workplace.  Mr. Cadiz shows elevations in ochratoxin and trichothecene mycotoxins . . . which likely resulted from this exposure to a severely water damaged/moldy workplace and contributed to his numerous health complaints including respiratory, gastrointestinal, urologic and immune system complaints.  In addition, he shows evidence of immune system dysfunction as well as abnormalities on pulmonary function testing consistent with his exposure.

Yet, the Board chose to credit the IME reports of the employer over Dr. Hope's opinion letter on this crucial issue, even though the employer's IME reports never addressed the presence of those mycotoxins at those levels in Cadiz's body.  The Board stated it resolved reasonable doubts in favor of the claimant, but it failed to address that the employer had failed to meet its burden of producing substantial evidence to overcome the presumption that Cadiz's injury was work-related.

(. . . continued)

31

of the injury-by-disease is unknown, that in itself is a salient

indication that the employer did not produce substantial

evidence to meet its burden of production.  As we noted in <u>Van</u>

<u>Ness</u>,

> [A doctor's opinion] that it was impossible to determine
> the cause of the aggravation does not constitute
> substantial evidence rebutting the presumption.  On the
> contrary, pursuant to <u>Akamine</u>, doubt as to the cause of the
> injury represents a salient index of <u>the absence of</u>
> <u>substantial evidence</u> required to overcome the presumption
> that the claim is compensable."

<u>Van Ness</u>, 131 Hawai'i at 564, 319 P.3d at 483. (citation and

quotation marks omitted).  An excerpt contained in Dr. Arora's

own IME report in the present case, credited by the Board,

acknowledges that "the point at which mold contamination becomes

a threat to health <u>is unknown</u>. (Emphasis added.)

2.  **The LIRAB and the ICA in <u>Cadiz I</u> mistakenly
    characterized the employer's IME reports as substantial
    evidence rebutting the presumption in favor of
    compensability.**

In the workers' compensation context, "substantial

evidence" means "a high quantum of evidence which, at the

minimum, must be relevant and credible evidence of a quality and

_____
(continued. . . )

In any event, it is not Cadiz's burden to establish that the
mycotoxins caused his adverse health conditions or that he was exposed to
them at work and not somewhere else.  Rather, it is the employer's burden to
prove through substantial evidence that the mycotoxins did <u>not</u> cause his
illnesses, even at the level of "slight aggravation" of existing conditions
such as asthma.  <u>Korsak</u>, 94 Hawai'i at 305, 12 P.3d at 1246 ("Under our
workers' compensation statute, the slightest aggravation or acceleration of
an injury by the employment activity mandates compensation.").  Yet the
employer's IME reports never addressed the scientifically verified levels of
harmful mycotoxins in Cadiz's body following his four years of employment in
what the Board itself found to be a moldy work environment.

quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work connected." Panoke, 136 Hawai'i at 462, 363 P.3d at 310; Van Ness, 131 Hawai'i at 558, 319 P.3d at 477.

In Cadiz I, the Board credited the IME reports by Drs. Cupo and Arora as providing substantial evidence to rebut the presumption in favor of compensability.  However, Dr. Cupo's litany of conclusory assertions that none of Cadiz's illnesses or symptoms were "caused, aggravated, or accelerated by job activities as a meat cutter for Times Supermarket," tracks the language of the test proposed for occupational disease by this court in Flor, 94 Hawai'i at 82, 9 P.3d at 394 (requiring, inter alia, that the injury-by-disease be "caused by conditions that are characteristic of or peculiar to the particular trade, occupation, or employment" (emphasis added)).  The conclusion repeated in each of Dr. Cupo's "diagnoses" is inconsistent with this court's decision in Van Ness, published little more than a month prior to the LIRAB's decision in Cadiz I.  Van Ness held that Flor's test is relevant for injury-by-disease claims going to the nature of the occupation or employment.  Van Ness, 131 Hawai'i at 559, 319 P.3d at 478.  However, Flor's test is not relevant for those injury-by-disease claims that go to the conditions or incidents of employment rather than to the very nature of the job.  For such situations, the traditional unitary

or nexus test is used. That test requires only "a causal connection between the injury and any incidents or conditions of employment." Van Ness, 131 Hawai'i at 560, 319 P.3d at 479. It does not require any assessment of the relation of an injury to the nature of the claimant's "job activities." Stated otherwise, Dr. Cupo's conclusions in his IME report are based on an inapplicable legal conclusion.

In addition, Dr. Cupo's conclusions cannot constitute "substantial evidence" sufficient to rebut the statutory presumption in favor of compensability. His sixteen formulaic conclusions, which he labels "diagnoses," cannot "justify a conclusion by a reasonable person that an injury . . . is not work-connected." Id. at 558, 319 P.3d at 477. Strictly speaking, Dr. Cupo's conclusions about the relation of Cadiz's symptoms to the nature of his job as a meatcutter are, under Van Ness, beside the point. Such conclusions are, in other words, not legally relevant in the present case and therefore cannot constitute substantial evidence rebutting the presumption in favor of compensability. Id. Unless Dr. Cupo's diagnoses constituted substantial evidence able to reasonably rule out the mycotoxins discovered in Cadiz's body as causes of some or all of his symptoms or injuries, his diagnoses do not add up to substantial evidence. Nor does postulating an allergy to dust

as an alternative explanation for Cadiz's many symptoms pass muster under the relevant legal standards.

In addition, the IME reports of both Dr. Cupo and Dr. Arora share a similar fatal flaw.  They represent attempts to assert that Cadiz's symptoms of illness are, in Dr. Cupo's words, "medically plausibly explainable by other medical conditions" without needing to resort to toxic mold exposure.  This line of analysis by the employer's IMEs, tacitly approved by the ICA, misconstrues the relevant legal standard.  "Hawaii's workers' compensation presumption places a heavy burden on the employer to disprove that an injury is work-related."  Korsak, 94 Hawai'i at 307, 12 P.3d at 1248 (emphasis added).  A plausible alternative medical explanation, without more, does not disprove that an injury is work-related.

A heart-attack may be "medically plausibly explainable" by an excess of cholesterol from eating too many french fries, but that does not mean that a claimant's heart attack was not to some extent either caused or aggravated by work-related stress.  See Akamine, 53 Haw. at 412, 495 P.2d at 1168 (noting that the employer offered plausible alternative non-work-related explanations for a heart attack but rejecting that standard and holding instead that the employee's death at work from a heart attack was compensable under Hawai'i workers' compensation law: "The primary focus of the medical testimony

should have been a discussion on whether the employment effort, whether great or little, in any way aggravated Mr. Akamine's heart condition which resulted in his death.")  See also Chung v. Animal Clinic, Inc., 63 Haw. 642, 651-52, 636 P.2d 721, 727 (1981) (finding that despite employer having offered a plausible alternative medical explanation for claimant's heart attack, including arteriosclerosis and jogging, the "heart attack was work-connected" and therefore compensable).

A recurring cough could be explained by a lingering version of the common cold, but it could also be explained by asbestosis.  Asserting that the cough is "medically plausibly explainable" by the common cold does not disprove asbestosis.  Similarly, a round hole through a person's skull might be "medically plausibly explainable" by the passage of a bullet, but that is not substantial evidence that Phineas Gage's on-the-job injury was not caused by a tamping iron accidentally transiting through his skull.[10]

---

[10]  Gage's famous workplace injury predated the widespread enactment of workers' compensation statutes, but it illustrates the difficulties with the "medically plausibly explainable by other conditions" standard deployed by Dr. Cupo.

In 1848, Gage, 25, was the foreman of a crew cutting a railroad bed in Cavendish, Vermont.  On September 13, as he was using a tamping iron to pack explosive powder into a hole, the powder detonated.  The tamping iron — 43 inches long, 1.25 inches in diameter and weighing 13.25 pounds — shot skyward, penetrated Gage's left cheek, ripped into his brain and exited through his skull, landing several dozen feet away. . . . In time, Gage became the most famous

(. . . continued)

"Medically plausibly explainable by other medical conditions" is neither the relevant medical nor legal standard in the context of workers' compensation, and the ICA erred by considering testimony resting on that standard to constitute substantial evidence rebutting the statutory presumption that an injury-by-disease "is causally related to the employment activity" or conditions. Chung, 63 Haw. at 650, 636 P.2d at 726. The fact that there may exist alternative medical explanations for the symptoms experienced by a claimant claiming injury-by-disease does not on its own amount to evidence substantial enough to rebut the presumption under the unitary or nexus approach of "a causal connection between the injury and any incidents or conditions of employment." Id. at 648, 636 P.2d at 725.

In order to overcome the presumption in favor of compensability, the employer must prove through substantial evidence that the injury or disease was not work-connected. Panoke, 136 Hawai'i at 461, 363 P.3d at 309; Korsak, 94 Hawai'i at 307, 12 P.3d at 1248. In evaluating whether the burden of

_____
(continued. . . )

> patient in the annals of neuroscience, because his case was the first to suggest a link between brain trauma and personality change.

Steve Twomey, Finding Phineas: An Accident with a Tamping Iron Made Phineas Gage One of the Most Famous Names in Neuroscience, Smithsonian, Jan. 2010, at 9-10.

producing substantial evidence has been met, "the slightest aggravation or acceleration of an injury by the employment activity mandates compensation."  Panoke, 136 Hawai'i at 461, 363 P.3d at 309; Van Ness, 131 Hawai'i at 562, 319 P.3d at 481 (citation omitted).  Suggesting plausible alternative explanations that do not rule out work-connection or even slight aggravation of pre-existing conditions fails to rise to the level of showing required to overcome the presumption in favor of compensability.  Van Ness, 131 Hawai'i at 558, 319 P.3d at 477.

Dr. Likewise's evocation of Cadiz's "preoccupation with multiple, medically unexplained somatic complaints," might— in some other legal context—shift the argument in favor of the employer, which hired Dr. Likewise.  HRS § 386-79 (requiring the injured employee "to submit to examination . . . by a duly qualified physician . . . designated and paid by the employer.").

But in the context of workers' compensation law, a lack of explanation for experienced symptoms or illnesses strengthens the presumption in favor of compensability instead of overcoming it.  Van Ness, 131 Hawai'i at 564, 319 P.3d at 483 (stating that "doubt as to the cause of the injury represents a salient index of the absence of substantial evidence required to overcome the presumption that the claim is compensable."

(quotation marks omitted)); Lawhead, 59 Haw. at 560, 584 P.2d at 125 (noting, in the workers' compensation context, "a strong legislative policy favoring awards in arguable cases." (citation omitted)). Dr. Likewise's diagnosis simply does not address the laboratory evidence of elevated levels of harmful mycotoxins in Cadiz's body. It was clearly erroneous for the LIRAB to conclude that Dr. Likewise's IME report represented a level of substantial evidence sufficient to rebut the presumption that Cadiz's claimed injury-by-disease was work connected. Van Ness, 131 Hawai'i at 558, 319 P.3d at 477; Korsak, 94 Hawai'i at 307, 12 P.3d at 1248 ("Hawaii's workers' compensation presumption places a heavy burden on the employer to disprove that an injury is work-related." (emphasis added)).

## IV. CONCLUSION

For the reasons stated above, we vacate the ICA's judgment on appeal which affirmed the LIRAB's decision and order in Cadiz I. Given our conclusion that the employer failed to provide sufficient substantial evidence in Cadiz I to meet its burden to produce evidence that, if believed, could overcome the presumption in favor of compensability, it is unnecessary for us to address the issues raised by the Board's decision and order in Cadiz II. We remand to the LIRAB with the instruction that Cadiz's injury-by-disease is compensable under Hawai'i's workers'

compensation law and for further proceedings consistent with
this opinion.

| | |
|---|---|
| Stanford H. Masui | /s/ Mark E. Recktenwald |
| Erin B.J.H. Masui | |
| for Petitioner | /s/ Paula A. Nakayama |
| | |
| Shawn L.M. Benton | /s/ Sabrina S. McKenna |
| Scott G. Leong | |
| Christine J. Kim | /s/ Richard W. Pollack |
| for Respondents | |
| | /s/ Michael D. Wilson |


