**Electronically Filed
Supreme Court
SCWC-20-0000084
30-DEC-2025
12:03 PM
Dkt. 52 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

ROXANNE K. LANE,
Petitioner/Claimant-Appellant-Appellant,

vs.

AVIS BUDGET GROUP, INC.,
Respondent/Employer-Appellee-Appellee,

and

GALLAGHER BASSETT SERVICES, INC.,
Respondent/Insurance Adjuster-Appellee-Appellee.

SCWC-20-0000084

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-20-0000084; CASE NO. AB 2017-006; DCD NO. 2-14-48809)

DECEMBER 30, 2025

McKENNA, ACTING, C.J., EDDINS, GINOZA, AND DEVENS, JJ.,
AND CIRCUIT JUDGE NICHOLS, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY DEVENS, J.

## I.    INTRODUCTION

This appeal arises from a workers' compensation claim filed by Roxanne Lane (Lane) with her employer Avis Budget Group Inc. (Avis or Employer).  The dispositive question in this controversy is whether Lane sustained a nasal fracture as a result of a vehicle collision that occurred at work.  The Director of the Department of Labor and Industrial Relations (DLIR Director) determined that Lane's nasal injury was a compensable work-related injury.[1]  On appeal to the Labor and Industrial Relations Appeals Board (LIRAB), the LIRAB reversed the DLIR Director's determination as to the nasal fracture, concluding that the injury did not result from the collision. The Intermediate Court of Appeals (ICA) affirmed the LIRAB.

We hold that the Employer did not meet its initial burden of production in adducing substantial evidence to rebut the legal presumption of compensability for Lane's nasal injury.

Lane was at work operating an Avis van when another vehicle reversed into the front of the van while Lane was at a full stop.  The evidence indicated that during the collision, Lane's body "went forward and backward, and her nose hit the steering wheel."

As a consequence of the collision, Lane sustained several

---

[1]     The DLIR Director denied compensability for Lane's claimed left ankle injury.

injuries and pursued a claim for workers' compensation benefits. In the Employer's WC-1 "Employer's Report of Industrial Injury" (WC-1 report), the Employer identified Lane's neck, low back, and right shoulder as injuries sustained in the collision. The Employer accepted liability for those injuries under Hawaiʻi Revised Statutes (HRS) Chapter 386. By accepting compensability for those injuries, the Employer implicitly conceded that the subject collision was of sufficient force to have caused Lane bodily injuries.

The only injury at issue in this appeal is a <u>right</u>-sided non-displaced nasal fracture, which Lane contends resulted from the collision, but was omitted from the Employer's WC-1 report. The Employer argues there was substantial evidence that Lane's nasal fracture was not caused by the collision, including a doctor's opinion that the force of the collision was insufficient to have caused Lane to strike her nose against the steering wheel, thus rebutting the statutory presumption of compensability. In opposition, Lane points to the medical records documenting her complaints and symptoms affecting the "right side of [her] face," "[p]ain along right side of nose," "sinus pain," "nasal congestion," and "facial pressure" that she reported to her doctors within hours and days after the collision, and which the LIRAB did not discredit. X-ray imaging taken seven days after the collision confirmed that Lane had

sustained a "[n]ondisplaced right-sided nasal bone fracture."

In support of its decision, the LIRAB relied on a biomechanics opinion provided by the Employer's medical doctor, who opined that the "force involved in the accident" was low and could not have caused Lane to hit her nose on the steering wheel. However, there was no evidence in the record that this doctor was qualified to offer such an opinion in that field of expertise.

We hold that the LIRAB's decision was, in part, clearly erroneous, and vacate the ICA's September 27, 2024 Judgment on Appeal, vacate in part the LIRAB's November 26, 2019 Order and January 22, 2020 Order Denying Reconsideration as they relate to the finding that Lane did not sustain a compensable work-related injury to her nose, affirm the DLIR Director's December 30, 2016 decision finding Lane's nasal injury was compensable, and remand the case to the LIRAB for further proceedings consistent with this opinion.

## II.  BACKGROUND

### A.  Lane's Injuries

Lane was employed with Avis as a transporter who delivered cars between the airport and hotels on Oʻahu. On October 26, 2014, Lane was operating an Avis van when she was involved in a motor vehicle collision in the airport parking lot. Lane was at a complete stop when a customer from another car rental agency

4

reversed their vehicle into the front of her van.  Lane testified that at the time of the impact, she was restrained by a seat belt and was "popping [her] horn."  She further testified that when the car hit the van's front bumper, her nose hit the steering wheel "hard."  Lane described the situation as a "commotion," as the other driver blamed her for causing the collision.

Later that same day, Lane was seen at the emergency room at Pali Momi Medical Center, which charted Lane's injuries and complaints, including "discomfort to the right side of [her] face" and "pain to [her] right neck[.]"  (Emphasis added.) Tenderness to her cervical back and right trapezius muscle was also entered in the emergency room records.  The records noted that Lane "[d]enie[d] head injury."  X-rays were taken of Lane's spine but not her nose.

The following day, on October 27, 2014, Lane was examined by Dr. Darwin Chan at Concentra Medical Centers.  Lane's ear, nose, and throat were "[r]eviewed and found to be negative." However, Dr. Chan reported that Lane was experiencing "facial pressure," lightheadedness, headache, and dizziness, along with neck and back pain.  Dr. Chan also indicated no "erythema or edema of the external ears or nose."

Two days after the collision, on October 28, 2014, Lane was seen by Dr. Rae Teramoto who noted in the medical records that

Lane was complaining of "[s]inus congestion and headache since yesterday[.]"  Significantly, Dr. Teramoto reported that Lane was experiencing "[p]ain along right side of [her] nose." (Emphasis added.)

The same day, Lane also saw Dr. Ronald Kienitz at Concentra Medical Centers.  Lane complained of sinus pain and congestion, joint pain, muscle pain, right shoulder pain, back pain, neck pain, joint stiffness, night pain, and headache.  Notably, Dr. Kienitz wrote in his records that Lane "[f]eels that the impact in [the motor vehicle accident] caused [sinus pain and congestion] to flare up."  Dr. Kienitz prescribed nasal sprays, and with respect to Lane's ear, nose, and throat exam, he reported "nasal congestion, sinus pain w/ percussion, sl large SM nodes[.]"

Lane was referred to physical therapy.  The October 29, 2014 therapy records documented continuing complaints of sinus pain and congestion along with neck pain.

That same day, Lane was seen by Dr. Jack Hsieh. Dr. Hsieh's records noted a frontal headache as well as neck pain, right shoulder pain, and low back pain.  The doctor's exam and assessment indicated that Lane was experiencing a cervical strain, right shoulder strain, lumbar spine strain, myofascial pain, and headaches with pain levels reaching 10/10 in intensity, with ten indicating the worst pain.  Dr. Hsieh's

"external inspection" of Lane's nose and ears was reported as "normal."[2]

Lane's therapy records from October 30, 2014 documented ongoing complaints of neck and mid-to-low back pain.

On November 2, 2014, seven days after the work accident, Lane went to the emergency room at Kapi‘olani Medical Center for Women and Children (Kapi‘olani Medical Center).  Lane initially went to the emergency room because her daughter was sick.  While at the hospital, Lane "registered to see why [she] was getting these headaches non stop and couldn't focus, couldn't concentrate on anything."  She was seen by Dr. Jaimie Tom, who recorded in the clinical notes that Lane's primary complaint was "persistent nasal pain that has been ongoing now for the past week."  Dr. Tom ordered x-ray imaging of Lane's nose which "show[ed] a nasal bone fracture."  Consistent with Lane's earlier complaints of pain along the <u>right</u> side of her nose, documented by Dr. Teramoto two days after the collision, the x-rays revealed a "[n]ondisplaced <u>right</u>-sided nasal bone fracture."  (Emphasis added.)  Dr. Tom diagnosed Lane with a nasal fracture, but also noted that there was no significant swelling, obvious deformity, septal hematoma, or septal deviation, with only "faint ecchymosis over the nasal bridge."

---

[2]     Dr. Hsieh's examination of Lane's ears, nose and throat noted "no hearing loss and no sore throat," but mentioned nothing about her nose other than the "external" inspection was normal.

Dr. Tom's records further reflected that Lane experienced facial pain after the collision and had "quite a bit of epistaxis, but that has resolved."[3]

On November 7, 2014, Lane was seen by Dr. Hsieh whose diagnosis included cervical spine strain, right shoulder strain, lumbar spine strain, lumbar radiculitis, headache, nasal fracture, and myofascial pain.

On November 24, 2014, Lane returned to Kapiʻolani Medical Center where she saw Dr. Anthony Dumpit, who diagnosed Lane with blurred vision, chest pain, nausea, dizziness, and headaches, and documented that Lane was experiencing tenderness in the sinuses but no nosebleeds.

The Employer's WC-1 report noted that Lane had sustained cervical, lumbar, and right shoulder injuries related to the subject motor vehicle collision. The Employer accepted compensability for those injuries. Lane later filed a WC-5 "Employee's Claim for Workers' Compensation Benefits" (WC-5 claim) seeking coverage for the additional injuries to her "head, brain, face, blurred vision, nose (fracture), neck, right shoulder, back, ribs [and] left ankle, [c]oncussion, [h]eadaches and dizziness," and dysphagia along with psychological injuries including depression, anxiety, and mental distress, which the

---

[3]    "Epistaxis" refers to nasal bleeding.

Employer denied.   (Emphasis added.)

## B.   Employer's Medical Examiner Reports

Pursuant to HRS § 386-79 (2015) (Medical examination by employer's physician), Lane was examined by two medical doctors designated by the Employer.

### 1.   Dr. Leonard Cupo

The first doctor, Dr. Leonard Cupo, examined Lane on January 13, 2015, over two months after the collision.  Lane's chief complaint at the time of the exam was nasal pain and pain to her cervical spine, right shoulder, and lumbosacral spine.

#### a.    No Acute Symptoms

Dr. Cupo concluded that Lane's nasal fracture was not caused by the collision.  Dr. Cupo opined that Lane's nasal fracture "bears no relationship to and was not caused, aggravated, or accelerated by the motor vehicle accident[.]" Dr. Cupo based his opinion on Lane's medical visits from October 26, 2014 to November 2, 2014, explaining that Lane did not complain of nasal pain or demonstrate an "abnormality" during the physical examination on October 26, 2014 such as "edema, ecchymosis, or tenderness."  That is to say, Dr. Cupo's opinion rested in part on the purported absence of acute physical symptoms.  Dr. Cupo explained that if Lane sustained a nasal fracture during the collision, she "would have been acutely and markedly symptomatic" when she was evaluated at the

emergency room on October 26, 2014.

Dr. Cupo wrote that Lane's first clinical notes relating to nasal pain were reported to Dr. Teramoto on October 28, 2014, but that Dr. Teramoto's report did not document that the nasal pain was related to the collision. Further, Dr. Cupo stated that the medical records from the day of the collision did not indicate any nasal bleeding despite Lane later reporting that she experienced nasal pain associated with epistaxis at the time of the collision. Dr. Cupo did not opine as to an alternative cause of Lane's nasal fracture.

### b.    Opinion on Biomechanics

Of particular significance, Dr. Cupo opined that the "intensity of force" from the impact was "low and thus could not have caused [Lane] to strike her nasal bridge on the steering wheel," especially if she was restrained by her seatbelt and beeping the horn with her right hand.

After viewing the video of the collision, Dr. Cupo supplemented his initial report stating that there was "no indication that the employee was in pain on the surveillance videotape of 10/26/14" and that the "intensity of the force" noted in his earlier report was confirmed by his review of the video.

Dr. Cupo did not quantify or otherwise explain the level of force required for Lane to strike the steering wheel and sustain

a nasal fracture, nor did he cite to any biomechanical, accident reconstruction, or engineering findings or calculations made in support of his opinion that the force generated by the impact was insufficient for Lane to have sustained a nasal injury. Dr. Cupo's report also did not reflect that he had any relevant qualifications, training, or expertise in these fields.

### 2. Dr. Vern Sasaki

Over two-and-a-half years after the collision, the Employer had Lane examined by a second medical doctor, Dr. Vern Sasaki, on July 6, 2017.  Dr. Sasaki concluded that Lane's nasal fracture did not result from the impact.  Dr. Sasaki opined that Lane's nasal fracture was first apparent on November 2, 2014, and that the prior medical examinations on October 26, 2014, October 27, 2014, and October 29, 2014 "did not reveal any findings of a nasal fracture or complaints of nose pain or swelling," including Dr. Hsieh's examination on October 29, 2014, which "revealed a normal nose examination."  Dr. Sasaki advanced that Lane's nasal fracture occurred "sometime after 10/29/14 and before 11/02/14 when her nasal fracture was diagnosed in the Emergency Room," but provided no opinion as to an alternative cause of Lane's nose injury.  Dr. Sasaki acknowledged that Lane reported facial pain on the right side of her face along with neck and back pain at the emergency room on the day of the collision, as well as sinus pain and headaches

11

during her follow-up visits at Concentra Medical Centers. Dr. Sasaki stated that with a nasal fracture, he would expect acute clinical symptoms to appear "almost immediately," and that the "amount of force" required to cause a nasal fracture would have to be "significant."

Dr. Sasaki also cited Dr. Cupo's review of the video footage of the collision, noting that Dr. Cupo's observations "validated that the collision was a low-speed collision[.]" Dr. Sasaki did not indicate that he personally reviewed the video.

## C.   Injuries Accepted by Employer

The Employer accepted Lane's neck, back, and right shoulder injuries as compensable workers' compensation injuries but denied liability for Lane's nasal injury.

## D.   DLIR Director's Decision

The DLIR Director reviewed the Employer's denial of Lane's nasal injury and the additional injuries claimed in Lane's WC-5 claim.  HRS § 386-73 (2015).

In a decision issued on December 30, 2016, the DLIR Director credited various medical reports, including the reports from the Pali Momi emergency room, Dr. Teramoto, Dr. Kienitz, and Dr. Hsieh, and noted that the Employer did not present an alternate explanation for Lane's nasal injury.  The DLIR Director reviewed the surveillance video of the collision from

12

two angles and observed an "obstruction from both angles in the form of tinted windows of the claimant's vehicle and a large umbrella."

The DLIR Director determined that Lane's nasal injury and the injuries to her neck, back, right shoulder, head, ribs, and vision were compensable work-related injuries caused by the collision, but did not find that Lane's left ankle injury was a compensable consequence of the collision.[4]

**E.    LIRAB's Decision**

Lane appealed the DLIR Director's decision on her left ankle to the LIRAB.  HRS §§ 386-73, -87 (2015).  As is relevant to this appeal, one of the issues raised before the LIRAB was whether Lane's nasal injury was caused by the subject collision.

At the LIRAB trial, Lane testified and described how the collision occurred: "So I reversed back, stopped completely. They're reversing back.  Popped my horn.  He just completely hit me by the right side of the bumper."  In describing the impact, she testified, "It was like a [sic] impact.  It was like [everything] just hit," with the impact causing a "dent in the rear of [their] car."  Lane further testified that she hit her nose "hard" on the steering wheel, and explained that when it

_____

[4]    On December 1, 2015, Lane suffered a left ankle injury while exiting a bus after a doctor's appointment.  Lane was diagnosed with a left ankle "sprain."  Lane sought workers' compensation for the ankle injury as the result and consequence of her compensable work-connected injuries related to the vehicle collision.

13

happened, it was "like a flash at the moment the car hit[.]" Lane also testified that she was "complaining the next day every day" about her nose to her doctors, who told her it was a sinus infection and only gave her nose spray and prescription medication that "wasn't working." As a result of hitting the steering wheel, Lane testified that she "[f]elt pain to [her] whole face," but did not tell the doctor at the emergency room that she hit her head on the steering wheel "because I just felt funny like I wanted to pass out after . . . the whole commotion. After I had to take the car back . . . just felt like fainting."

The Employer did not call Dr. Cupo or Dr. Sasaki, or any other witness to testify at the trial.

Following the trial, the LIRAB issued its decision affirming in part and reversing in part the DLIR Director's decision. Relevant to this appeal, the LIRAB affirmed the compensability of Lane's injuries to her head, ribs, and vision after determining that the Employer had not met its burden of producing substantial evidence to rebut the presumption of compensability. However, the LIRAB reversed the DLIR Director's decision as to Lane's nasal fracture, determining that it was not a work-related injury. As to Lane's nasal injury, the LIRAB concluded that the Employer: (1) "met its burden of producing substantial evidence to rebut the presumption for compensability"; and (2) "met its burden of persuasion to rebut

the presumption of compensability."  The LIRAB's determination was based primarily on the reports from Dr. Cupo and Dr. Sasaki.

The LIRAB issued the following pertinent findings of fact (FOFs):

> 7.    With regard to Claimant's nose, Dr. Cupo opined that Claimant's nose fracture was not caused, aggravated, or accelerated by the October 26, 2014 accident.  He explained that Claimant did not complain of nasal pain or abnormality when seen at the emergency room and that the force involved in the accident could not have caused her to strike her nasal bridge on the steering wheel, specially [sic] if she had her right hand on the steering wheel to beep her horn.
>
> 8.    To Dr. Sasaki, Claimant reported that her head and face hit the steering wheel in the October 26, 2014 accident, but she did not have a bloody nose.  Dr. Sasaki opined that Claimant's nasal fracture occurred between October 29, 2014 and before November 2, 2014.
>
> 9.    The foregoing is substantial evidence that, if true, would be sufficient to rebut the presumption of compensability with regard to Claimant's nose.
>
> 10.    Employer met its burden of production to initially present substantial evidence that if true, could rebut the presumption that Claimant's nose fracture was not related to the October 26, 2014 accident.
>
> 11.    The October 26, 2014 collision was not "extreme," as stated by PA Acree.
>
> 12.    Dr. Cupo's description that the collision did not even move the van, is more accurate, in that the video showed that it only caused a slight quiver.
>
> 13.    Upon exiting the vehicle a short time after the collision, Claimant did not attend to her face or nose.
>
> 14.    Claimant did not complain of any issues with regard to her nose when she visited the emergency room on October 26, 2014.
>
> 15.    The Board credits Dr. Chan's October 27, 2014 examination of Claimant's nose to have no erythema or edema present.
>
> 16.    The Board credits Dr. Hsieh's October 29, 2014 examination of Claimant's nose to be normal.
>
> 17.    The Board does not credit Claimant's November 2, 2014 representation to emergency personnel that she had "quite a

15

bit of epistaxis."

18.    The Board credits her representation to Dr. Sasaki that she did not have a bloody nose.

19.    The Board also credits Dr. Cupo's opinion that the force of the collision was low and could not have caused Claimant to strike her nasal bridge on the steering wheel, particularly because she was beeping her horn.

20.    Weighing the evidence elicited by Employer against the evidence elicited by Claimant, Employer met its burden of persuasion to rebut the presumption of compensability.

(Emphases added.)

The LIRAB also issued conclusions of law (COLs).  Relevant here, COL 4 provided, "Claimant did not sustain a personal injury to her nose on October 26, 2014, arising out of and in the course of employment."

Lane's motion for reconsideration was denied by the LIRAB.

**F.    ICA Proceedings**

**1.    Parties' Arguments to the ICA**

Lane appealed to the ICA contending that the Employer did not present substantial evidence to overcome the presumption of compensability and, thus, the LIRAB erred in determining that her nasal injury was not a work-related injury.

Lane challenged the LIRAB's FOFs 7-12, 14-17, 19 and 20 and COL 4 relating to her nasal fracture.  Lane argued that the LIRAB erred because there was no substantial, reliable, and consistent evidence to rebut the presumption of compensability, including substantial evidence to meet the Employer's initial burden of production.  Specifically, Lane pointed to the post-

collision examinations by Dr. Chan and Dr. Hsieh, which did not establish the absence of a fracture because no x-ray imaging was administered.

Lane also argued that the LIRAB erred in crediting Dr. Cupo's opinion "regarding the force of the collision" because: (1) the LIRAB ignored Dr. Cupo's bias; (2) Dr. Cupo's conclusion that the van did not move after the collision was inconsistent with the LIRAB's finding that the van "quivered"; and (3) Dr. Cupo was not qualified as a biomechanics expert or accident reconstruction expert.

Lane further asserted that Dr. Cupo's and Dr. Sasaki's reports contained general medical conclusions and failed to identify the cause of Lane's nasal fracture. Additionally, Lane argued that neither Dr. Cupo nor Dr. Sasaki were qualified to opine on the video of the collision.

Lane also contended that because the Employer had conceded that the collision caused injuries to her neck, back, head, ribs, and vision, the Employer could not at the same time claim that the collision was too minimal for Lane to have injured her nose. Lane asserted that any reasonable doubt as to whether an injury is work-connected should be resolved in her favor, and that the Employer failed to provide an alternative explanation as to the cause of her nasal fracture other than the collision.

Lane further argued that the LIRAB erred in denying her

17

motion for reconsideration.

The Employer countered that there was substantial evidence to overcome the presumption of compensability. The Employer noted that: Lane's testimony about her experiencing nasal bleeding was not credited; Dr. Chan and Dr. Hsieh reported that Lane's nose was normal; the collision did not move the van and only caused a "slight quiver"; upon exiting her vehicle Lane did not "attend to her face or nose," or complain about her nose when she went to the emergency room on the day of the collision; and Dr. Cupo determined that the force during the collision could not have caused Lane to strike her face on the steering wheel while beeping the horn and restrained by a seatbelt. The Employer emphasized that the LIRAB's credibility determinations should not be disturbed on appeal.

The Employer also asserted that the LIRAB did not abuse its discretion in denying Lane's motion for reconsideration because no new evidence or arguments were presented.

### 2. Summary Disposition Order

The ICA affirmed the LIRAB's decision, concluding that substantial evidence supported the LIRAB's findings and that the Employer met the "high burden" of rebutting the presumption of compensability for Lane's nasal injury. The ICA cited Dr. Cupo's and Dr. Sasaki's opinions that Lane would have been symptomatic had she sustained a nasal fracture in the collision,

18

and that she did not report a nasal injury nor were there clinical symptoms of bruising, swelling, or nose bleeding on the day of the collision and the few days thereafter.  The doctors' reports, the ICA found, supported the Employer's position that the nasal fracture was not caused by the collision.

The ICA concluded:

> [T]he LIRAB did not clearly err in crediting the doctors' opinions, which specifically, directly, and expressly address the presumption that Lane injured her nose in the October 26, 2014 workplace accident.  Accordingly, we further conclude that the LIRAB did not err or abuse its discretion in entering the November 26, 2019 Order.

The ICA also concluded that the LIRAB did not abuse its discretion in denying Lane's motion for reconsideration because Lane did not make any argument in support of this point of error.

## G.    Supreme Court Proceedings

### 1.    Application for Writ of Certiorari

We accepted Lane's application for writ of certiorari.[5] Lane's primary contention is that the ICA erred in affirming the LIRAB's decision because the Employer did not meet its heavy burden of producing substantial evidence to overcome the presumption of compensability for her nasal injury, i.e., the Employer failed to disprove that the injury is work-connected. Lane notes that the medical records reflected that she

---

[5]    Lane timely filed an amended application for writ of certiorari.

19

complained of discomfort to the right side of her face during the initial Pali Momi emergency room visit and complained of nasal pain and congestion to Dr. Teramoto and Dr. Kienitz, which neither Dr. Cupo nor Dr. Sasaki addressed.

Lane also contends that the ICA decision is inconsistent with this court's prior decisions regarding the evidence necessary to overcome the presumption of compensability, citing primarily to our decision in Cadiz v. QSI, Inc., 148 Hawaiʻi 96, 468 P.3d 110 (2020).

### 2.    Employer's Response

The Employer counters that the LIRAB properly credited Dr. Cupo's and Dr. Sasaki's medical opinions rather than Lane's testimony.  The Employer asserts that it carried its burden of rebutting compensability because both Dr. Cupo and Dr. Sasaki concluded that the collision was low-impact and that if Lane had sustained her nasal fracture during the collision, she would have immediately experienced symptoms.  The Employer further contends that Dr. Cupo's and Dr. Sasaki's opinions were properly credited by the LIRAB, the ICA correctly upheld the LIRAB's weighing of the evidence, and the LIRAB was not required to resolve any conflicts in the evidence in Lane's favor.

### III. STANDARDS OF REVIEW

"Appellate review of a LIRAB decision is governed by HRS §

20

91-14(g)."[6]  Skahan v. Stutts Constr. Co., Inc., 148 Hawaiʻi 460,

466, 478 P.3d 285, 291 (2021) (citations and brackets omitted).

> Under those provisions, the reviewing court "may affirm the decision of the agency or remand the case with instructions for further proceedings."  The reviewing court also "may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders" (1) violate provisions of the constitution or a statute, (2) are beyond the agency's statutory authority or jurisdiction, (3) used "unlawful procedure," (4) were "[a]ffected by other error of law," (5) were clearly erroneous, or (6) were arbitrary or capricious "or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Ihara v. State Dep't of Land & Nat. Res., 141 Hawaiʻi 36, 41, 404

P.3d 302, 307 (2017) (citing HRS § 91-14(g)(1)-(6)) (cleaned

up).

> The LIRAB's conclusions of law are reviewed de novo, under the right/wrong standard.  Its findings of fact are

---

[6]    HRS § 91-14(g) (Supp. 2016) provides:

> (g)    Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1)    In violation of constitutional or statutory provisions;
>
> (2)    In excess of the statutory authority or jurisdiction of the agency;
>
> (3)    Made upon unlawful procedure;
>
> (4)    Affected by other error of law;
>
> (5)    Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6)    Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

21

> reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record.  Like any agency findings, the LIRAB's findings should be sufficient to allow the reviewing court to track the steps by which the agency reached its decision.

Cadiz, 148 Hawai'i at 107, 468 P.3d at 121 (cleaned up).

A finding of fact "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made."  Est. of Klink ex rel. Klink v. State, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007) (citation omitted).

"In the workers' compensation context, substantial evidence means a high quantum of evidence which, at the minimum, must be relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable person that an injury or death is not work connected."  Borrson v. Weeks, 155 Hawai'i 490, 496, 567 P.3d 195, 201 (2025) (citing Panoke v. Reef Dev. of Hawaii, Inc., 136 Hawai'i 448, 462, 363 P.3d 296, 310 (2015)) (quotations and brackets omitted).  Substantial evidence "must be evidence such as a reasonable mind might accept as adequate to support a claim."  Acoustic, Insulation & Drywall, Inc. v. Labor & Indus. Relations Appeal Bd., 51 Haw. 312, 314, 459 P.2d 541, 543 (1969).

## IV.  DISCUSSION

The crux of Lane's contention is that the Employer failed to produce substantial evidence to overcome the statutory presumption that her nasal fracture was a work-related injury.[7] Even with full regard and due deference to the LIRAB, we hold that the Employer did not adduce substantial evidence to meet its initial burden of production to rebut the presumption of compensability.  The evidence relied upon by the LIRAB, particularly the biomechanics opinion from Dr. Cupo, lacked foundation to be considered and thus lacked probative value.

"Hawaii's workers' compensation statute is to be accorded beneficent and liberal construction in favor of the employee, to fulfill the humanitarian purposes for which it was enacted." Respicio v. Waialua Sugar Co., 67 Haw. 16, 18, 675 P.2d 770, 772 (1984).  HRS Chapter 386 entitles employees injured in the course of employment to compensation.  HRS § 386-3 (2015).

HRS § 386-85 creates a rebuttable presumption that an employee's claim is compensable.  A claim for compensation is presumed to be a work-related injury in the absence of substantial evidence to the contrary.  HRS § 386-85 (2015).  The presumption is that the claimed injury is causally related to

_____

[7]    In her points of error, Lane appears to argue that the ICA applied the incorrect standard of review; however, Lane does not present any argument to support this assertion and, further, the ICA correctly applied the clearly erroneous standard of review to the LIRAB's FOFs and right/wrong standard to the LIRAB's COLs.  See Skahan, 148 Hawaiʻi at 468 n.7, 478 P.3d at 293 n.7.

the employment activity.  Korsak v. Hawaii Permanente Med. Grp.,
94 Hawaiʻi 297, 307, 12 P.3d 1238, 1248 (2000); Cadiz, 148
Hawaiʻi at 107, 468 P.3d at 121 (citing HRS § 386-85) ("The
workers' compensation statute rests on the presumption that a
claimed injury is work-connected and therefore compensable.").
This presumption is one of the "keystone principles" of our
workers' compensation system.  Flor v. Holguin, 94 Hawaiʻi 70,
79, 9 P.3d 382, 391 (2000) (citation omitted).  "That
presumption is paramount, in part, because the workers'
compensation statute provides an injured employee's exclusive
remedy for an injury arising out of and in the course of
employment."  Cadiz, 148 Hawaiʻi at 99, 468 P.3d at 113 (cleaned
up).

The presumption of compensability places a "heavy burden on
the employer to disprove that an injury is work-related."
Korsak, 94 Hawaiʻi at 307, 12 P.3d at 1248.  This presumption "is
not a mere procedural device that disappears upon the
introduction of contrary evidence."  Id. (citing Akamine v.
Hawaiian Packing & Crating Co., 53 Haw. 406, 408, 495 P.2d 1164,
1166 (1972)).  To rebut the presumption of compensability, the
employer has the burden of going forward with the evidence,
which is the burden of production; and once the burden of
production is met, the employer then has to meet the burden of

persuasion.  Cadiz, 148 Hawaiʻi at 99–100, 468 P.3d at 113–14 (citation omitted).

The burden of production requires the employer to initially introduce substantial evidence that rebuts the presumption that the injury is work-related.  Id. (citation omitted).  "After the trier of the facts first makes the determination as to whether the evidence adduced by the employer is substantial[,] then [they are] to weigh and consider the evidence offered by the employer against the evidence offered by claimants supportive of the claim."  Acoustic, Insulation & Drywall, Inc., 51 Haw. at 316, 459 P.2d at 544.

"Substantial evidence" signifies a high quantum of evidence that is, at a minimum, relevant and credible of a quality and quantity sufficient to justify a conclusion by a reasonable person that the injury is not work connected.  Korsak, 94 Hawaiʻi at 307, 12 P.3d at 1248 (citation omitted).  "In evaluating whether the burden of producing substantial evidence has been met, 'the slightest aggravation or acceleration of an injury by the employment activity mandates compensation.'"  Cadiz, 148 Hawaiʻi at 108, 468 P.3d at 122 (quoting Panoke, 136 Hawaiʻi at 461, 363 P.3d at 309).  If substantial evidence is not adduced, the "claimant must prevail."  Chung v. Animal Clinic, Inc., 63 Haw. 642, 650, 636 P.2d 721, 726–27 (1981).  If substantial evidence is adduced,

the LIRAB must then weigh and consider the evidence offered by the parties with any reasonable doubts as to whether an injury is work-related resolved in favor of the claimant.  Akamine, 53 Haw. at 409, 495 P.2d at 1166.

Here, the Employer did not meet its initial burden of producing substantial evidence to rebut the presumption of compensability.  Therefore, we need not reach the burden of persuasion.  See id. at 413, 495 P.2d at 1169.

## A.   Employer did not meet its burden of producing substantial evidence to rebut the presumption of compensability.

The LIRAB found, and the ICA affirmed, that the Employer met its initial burden of producing substantial evidence to rebut the presumption of compensability with respect to Lane's nasal injury.  The LIRAB's determination was premised on two FOFs.  The first finding, FOF 7, relied on Dr. Cupo's opinions that: (1) the nasal fracture was not caused by the impact; (2) Lane did not complain of nasal pain or abnormality at the emergency room; and (3) the "force involved in the accident could not have caused her to strike her nasal bridge on the steering wheel, specially [sic] if she had her right hand on the steering wheel to beep her horn."  The second finding, FOF 8, was based on Dr. Sasaki's opinion that Lane did not have a bloody nose and that "Claimant's nasal fracture occurred between October 29, 2014 and before November 2, 2014."

26

Standing on these two FOFs, the LIRAB concluded that these FOFs constituted "substantial evidence" to rebut the presumption of compensability with respect to Lane's nose injury, and that the "Employer met its burden of production[.]"

The LIRAB then weighed Lane's medical records generated from October 26, 2014 through October 29, 2014 together with Dr. Cupo's and Dr. Sasaki's reports, concluding that the Employer met its burden of persuasion to overcome the presumption of compensability. Lane cites Cadiz for the contention that the Employer did not meet its initial burden of production. We agree with Lane.

1. **The record lacks foundation for Dr. Cupo's opinion pertaining to biomechanics.**

This case rests on whether Lane struck her nose on the steering wheel. And if Lane struck her nose on the steering wheel, the pertinent question is whether that could have, in any way, caused her nose injury. See Korsak, 94 Hawaiʻi at 308, 12 P.3d at 1249.

As noted, in FOF 7, the LIRAB relied on Dr. Cupo's opinion in concluding that the "force involved in the accident" could not have caused Lane to strike her nose on the steering wheel.

The LIRAB clearly erred because there is nothing in the record to indicate Dr. Cupo was qualified to render such an opinion. Dr. Cupo did not cite to any credentials that

qualified him as a biomechanics or accident reconstruction expert.  Also, he only offered a "generalized" opinion as to the force of the impact.  See id. at 308, 12 P.3d at 1249 (affirming that "generalized medical opinions do not constitute substantial evidence").

In concluding that the Employer met its burden of production, the LIRAB relied on Dr. Cupo's opinion that the force involved in the collision was "low and could not have caused [Lane] to strike her nasal bridge on the steering wheel," especially if she had her right hand on the steering wheel to beep the horn.[8]  This opinion was offered without any calculation of the force generated by the collision or the amount of force transmitted to Lane's body; any determination as to whether Lane was sitting completely back in the driver's seat or leaning forward at impact placing her body and face in closer proximity to the steering wheel; or any discussion of whether Lane's right arm was bent at the elbow or fully extended as she was beeping the horn.

This technical and complex subject matter is typically reserved for experts in biomechanics, accident reconstruction,

---

[8]    Dr. Cupo opined that Lane's right shoulder injury was not caused by the collision, specifically stating, "The right shoulder was not a body part injured at the time of the motor vehicle accident of 10/26/14."  However, not even the Employer deemed Dr. Cupo's opinion to be credible, as the Employer "accepted liability" for Lane's right shoulder as a compensable body part injured in the collision.

28

engineering, and other disciplines who have the requisite training and experience in these specialized fields.  See Loren Peck, How Sound Is the Science? Applying Daubert to Biomechanical Experts' Injury Causation Opinions, 73 Wash. & Lee L. Rev. 1063, 1090-1110 (2016).  Biomechanics experts analyze motor vehicle collisions utilizing physics and engineering principles, along with vehicle manufacturing information, to assess the forces generated in a collision.  The analysis involves accident reconstruction, which examines factors such as vehicle weights, impact velocities, impact angles, damage patterns, vehicle crashworthiness, occupant dynamics, injury tolerance thresholds, and environmental factors, along with other relevant data to analyze the forces and energy transfers involved in a collision.  Cf. Udac v. Takata Corp., 121 Hawaiʻi 143, 150, n.8, 214 P.3d 1133, 1140, n.8 (Ct. App. 2009) (Expert Dr. Banks, who had a medical degree and engineering degree, and taught courses in biomechanics and injury causation analysis, "testified that he followed five steps in conducting his injury causation analysis: (1) vehicle motion or vehicle dynamics, (2) occupant motion or occupant kinematics, (3) biomechanics, (4) injury potential/injury analysis, and (5) review of medical records.  Dr. Banks testified that '[b]iomechanics is the application of the science of mechanics to biological

systems.'").

Thoens v. Safeco Insurance Co. of Oregon involved an expert opinion on the biomechanics of a motor vehicle collision.  356 P.3d 91 (Or. App. 2015).  There, the biomechanics expert opined as to whether the forces associated with the collision were sufficient to cause injury to the vehicle occupant.  Id. at 101. The expert testified to his education and training, which included a bachelor's degree in engineering, a master's degree in biomedical engineering, and a Ph.D. in biomedical engineering.  Id.  He also described his significant work and research background in biomechanics.  Id. at 101.

The Court of Appeals of Oregon found the biomechanics expert's opinion scientifically valid.  Id. at 110.  The court considered, inter alia, the expert's calculation of the collision force applied to the driver's vehicle and "how that force was transmitted to the driver's seat, using principles of physics and taking into account the construction of the car and its components"; analysis of "how plaintiff's body would have been affected by that force, given her 'body habitus, her height, weight, how she was seated inside the vehicle, [and] what type of restraint' was used"; and comparison of the forces that plaintiff's body had "experienced in the collision" to a "'known level of human tolerance' based on studies of vehicle collisions and crash tests as well as his own study of human

30

tissues and how they respond to various stresses."[9]  Id. at 102.

Here, there was no showing through testimony, curricula vitae, or other relevant evidence that Dr. Cupo or Dr. Sasaki, neither of whom testified at the LIRAB trial, possessed the requisite expertise or were otherwise qualified to render forensic biomechanics, vehicular accident reconstruction, or engineering opinions relating to the collision.  See State ex rel. Jones v. Recht, 655 S.E.2d 126, 132 (W. Va. 2007) (A medical doctor's testimony "must be strictly restricted to medical testimony" and "[i]ssues regarding the force of impact must be redirected to experts qualified in accident reconstruction or biomechanics.").  Nor was there any evidence of scientific methods, studies, or analysis performed in furtherance of Dr. Cupo's opinion that it was "impossible" for Lane to have struck her nose on the steering wheel based on the

---

[9]    See also Maines v. Fox, 190 So.3d 1135, 1142 (Fla. Dist. Ct. App. 2016) (holding that a medical doctor with expertise in biomechanical engineering should have been able to testify to forces involved in a motor vehicle collision and whether those forces were enough to cause claimant's injuries); Johnston-Forbes v. Matsunaga, 333 P.3d 388, 391 (Wash. 2014) (biomechanics expert allowed to testify where the expert reviewed engineering data on both vehicles, bumper crash test information, and performed impact tests on both bumpers); Wilson v. Rivers, 593 S.E.2d 603, 604-06 (S.C. 2004) (finding that a medical expert with a degree in physiology and training in biomechanics who "conducted over 800 impact and injury causation analyses" and had been qualified as an expert in biomechanics in other states, was qualified to testify to forces involved in a motor vehicle collision).

31

force involved in the collision.[10]

In light of the foregoing, we find that the LIRAB erred in relying on Dr. Cupo's opinion on biomechanics, which lacks foundation and does not justify a conclusion by a reasonable person that Lane's nasal injury was not work-related.  See Korsak, 94 Hawaiʻi at 308, 12 P.3d at 1249.

Moreover, Dr. Cupo's report represents the kind of generalized opinion this court has previously warned against and summarily rejected in Korsak and Akamine.  Korsak, 94 Hawaiʻi at 308, 12 P.3d at 1249 ("[P]ursuant to Akamine, generalized medical opinions do not constitute substantial evidence."); see Akamine, 53 Haw. at 410, 495 P.2d at 1167–68.  Thus, Dr. Cupo's opinions on biomechanics, which Dr. Sasaki relied on for his opinions, cannot be sustained as substantial evidence.[11]

Given the deficiency of the LIRAB's findings, the critical

_____

[10]    Although Dr. Cupo opined that it was "impossible" that Lane struck the steering wheel during the impact, the LIRAB found that the collision caused her a head injury.  Upon review of the surveillance video, the LIRAB acknowledged that the video had "no clear visual of Claimant's position or movement within the van[,]" yet that same video purportedly supported Dr. Cupo's opinion that the collision did not cause Lane's nasal fracture.  And although the LIRAB found that the collision caused a "slight quiver," it nevertheless credited Dr. Cupo's opinion that the van did not move.

[11]    Lane also argues in conclusory fashion that Dr. Cupo is inherently biased because the Employer retained him to examine Lane.  In support, Lane filed Dr. Cupo's 1099 tax form and his testimony from an unrelated workers' compensation case, in which Dr. Cupo testified that his average fee was "approximately $800 per [independent medical examination (IME)]."  Dr. Cupo was retained by the Employer pursuant to HRS § 386-79 which allows an employer to designate a physician of their choice to examine a claimant at the expense of the employer.  This is the employer's statutory right.  Neither the LIRAB nor the ICA addresses the argument regarding Dr. Cupo's
(continued . . .)

question is whether striking the steering wheel could have, in any way, fractured Lane's nose with respect to medical causation. Korsak, 94 Hawaiʻi at 308, 12 P.3d at 1249 (concluding that IME reports failed to directly address whether claimant's physical therapy session could have exacerbated claimant's condition and were thus insufficient as substantial evidence). Neither Dr. Cupo nor Dr. Sasaki answered that question, nor did either doctor point to an alternative cause of Lane's injury.

> **2. Lane's medical records documented clear and undisputed evidence of facial and nasal complaints from October 26, 2014 through October 29, 2014.**

In FOFs 7 and 8, the LIRAB credited Dr. Sasaki's opinion that the nasal fracture occurred in the compressed window between October 29, 2014 and November 2, 2014, and Dr. Cupo's opinion that Lane did not complain of any nasal related symptoms at the emergency room.[12] Dr. Sasaki based his medical causation opinion on the medical records generated between October 26, 2014 and October 29, 2014 in concluding that the records did not reveal any "complaints of nose pain or swelling."

Dr. Sasaki's opinion misstates the undisputed evidence. The medical records from Drs. Kienitz and Teramoto clearly

---

bias; however, on this record, we do not find this argument persuasive.

[12] Dr. Sasaki stated that the nasal fracture occurred "after" October 29, 2014.

documented Lane's nasal symptoms, including persistent nasal "pain," before October 29, 2014, which Dr. Sasaki's report acknowledged but failed to address.  Neither Dr. Sasaki nor Dr. Cupo specifically explained or accounted for Lane's right-sided facial complaints in the emergency room[13] or the other documented complaints Lane was experiencing before October 29, 2014, which included "facial pressure," persistent "sinus pain and congestion" since the collision, and "[p]ain along right side of nose" that Lane attributed to the "impact in [motor vehicle accident][.]"

The x-ray imaging taken on November 2, 2014 confirmed that Lane sustained a right-sided non-displaced nasal fracture, the same side she had been complaining about before October 29, 2014.  While the medical records reflect that her neck pain had improved from the date of the collision leading up to November 2, 2014, the same records also document that "she continues to have facial pain."  There was no evidence that Lane was experiencing any ongoing or frequent nasal or facial

_____

[13]    The record reflects that the collision occurred at approximately 1:52 p.m. on October 26, 2014, and that Lane was seen in the emergency room at 5:46 p.m., or within four hours of the incident.  There is no indication in the emergency room report that Lane's nose was ever examined on October 26, 2014, with the records showing that Lane seemed more preoccupied with her neck pain, which apparently prompted the doctors to order cervical x-ray imaging.  The report references a physical examination of her head, ears, eyes, neck, cardiovascular system, pulmonary/chest, abdominal, musculoskeletal, neurological, and skin.  However, the section pertaining to "HENT" (head, ears, nose, and throat) does not provide any information, as that section was left blank.  No x-rays were taken of Lane's face or nose.

symptoms before the collision.[14] And although it is not required that an employer provide evidence that definitively establishes the cause of a claimant's injury, neither Dr. Cupo nor Dr. Sasaki explained why Lane would have started suffering right-sided facial and nasal symptoms following the collision if the impact had not caused the right-sided nasal fracture.

The Employer argued that the absence of acute external physical symptoms, or what Dr. Cupo referred to as an "abnormality," in the medical records before October 29, 2014 ruled out the possibility that Lane sustained the nasal fracture from the collision. But Lane did not exhibit such symptoms on November 2, 2014 when x-rays revealed her nasal fracture.[15] Indeed, the Kapiʻolani Medical Center records from that date indicated that Lane was not "acutely and markedly symptomatic" any more than she was during the preceding days when she was complaining of right-sided facial symptoms and pain along the right side of her nose.[16] Dr. Cupo himself interpreted those same records as documenting "no edema or deformity of the nasal bridge" or "septal deviation or hematoma[,]" yet there is no

---

[14] Both Dr. Cupo and Dr. Sasaki engaged in an extensive review of Lane's prior medical records and history. Neither report alluded to any entries or doctor visits relating to nasal or sinus complaints predating the collision.

[15] On October 29, 2014, Dr. Hsieh reported doing an "external inspection" of Lane's ears and nose, which he indicated was "normal."

[16] Kapiʻolani Medical Center's medical records from November 2, 2014--seven days after the collision--confirmed the absence of any "significant swelling," "obvious deformity," "septal hematoma," or "septal deviation."

question that Lane's nose was fractured.

As to Dr. Sasaki's opinion that Lane did not have a bloody nose, which the LIRAB relied on in FOF 8, the Employer did not present any evidence suggesting that a person with a non-displaced nasal fracture will necessarily experience bleeding. Significantly, the medical records from Kapi'olani Medical Center advised Lane that with a "minor fracture," "[s]ometimes, there is also bleeding from the nose" and that it "may" cause swelling.  (Emphasis added.)  That is to say, there may or may not be any bleeding or swelling with a minor non-displaced nasal fracture and, therefore, the absence of such symptoms is not a definitive indicator to rule out that a person has suffered a fracture.

In Panoke v. Reef Development of Hawaii, Inc., this court held that two medical reports submitted by the employers' doctors and the expert testimony of a third employer doctor did not rebut the presumption of compensability because the doctors did not address how Panoke, a construction worker injured while maneuvering equipment on a worksite, was "asymptomatic" for a shoulder injury prior to the workplace incident, "but then started suffering from shoulder problems shortly afterwards." 136 Hawai'i at 461, 363 P.3d at 309.  The claimant in Panoke did not exhibit "immediate symptoms" following the incident and did not begin to complain of symptoms until "approximately two weeks

after the work accident." Id. at 463-64, 363 P.3d at 311-12.

This court concluded that the absence of symptoms following a work accident was insufficient to overcome the presumption of a covered work-related injury. Id. We held that an IME doctor's testimony that Panoke's injury was not aggravated by the accident because "[h]e would expect immediate symptoms given the amount of tears" was "not sufficient to constitute substantial evidence." Id. at 463, 363 P.3d at 312 (quotations omitted). We specifically noted, "[T]here is nothing in the record to explain why Panoke would have started experiencing serious shoulder pain approximately two weeks after the work accident if the work accident had not caused the injury or aggravated some pre-existing injury." Id. at 464, 363 P.3d at 312. "As a result, the LIRAB erred in concluding that [the employer] had adduced substantial evidence to overcome the presumption that Panoke's shoulder injuries were related to the . . . work accident as he alleged." Id.

Similar to the employer's doctors in Panoke, neither Dr. Cupo nor Dr. Sasaki explained why Lane was asymptomatic prior to October 26, 2014 but then started experiencing right-sided nasal and facial symptoms shortly after the collision occurred and continuing through October 29, 2014. Panoke, 136 Hawaiʻi at 461, 464, 363 P.3d at 309, 312. Here, the LIRAB also relied on Dr. Cupo's and Dr. Sasaki's opinions that Lane would

37

have experienced immediate symptoms if the fracture were caused by the collision. In contrast to the claimant in Panoke, who began complaining of symptoms two weeks after the workplace incident, Lane was diagnosed with a nasal fracture within a week of the incident, after x-ray imaging revealed a fracture. Contrary to Dr. Sasaki's conclusions, the record reflects that Lane did experience immediate and continuing right-sided facial and nasal symptoms from the date of the collision, October 26, 2014, through October 29, 2014, as well as on November 2, 2014, the date x-ray imaging revealed the fracture.

Dr. Cupo's and Dr. Sasaki's opinions that Lane could not have sustained the nasal fracture before October 29, 2014 due to the absence of immediate symptoms do not align with the uncontroverted evidence, do not address the undisputed findings charted in Lane's medical records from October 26, 2014 through November 2, 2014, and do not provide a sufficient degree of specificity to constitute substantial evidence to rebut the presumption that Lane's nasal injury was work-related. Accordingly, the Employer did not satisfy its initial burden of production in rebutting the statutory presumption of compensability.

**B. Employer did not meet its burden of persuasion.**

Assuming, arguendo, the Employer had met its burden of production, the remaining evidence in support of the Employer's

38

burden of persuasion was, at best, conflicting. Any such doubts would be resolved in Lane's favor. Borrson, 155 Hawaiʻi at 497, 567 P.3d at 202 (citing Akamine, 53 Haw. at 409, 495 P.2d at 1166); Chung, 63 Haw. at 652, 636 P.2d at 727 (Where the evidence conflicts, "the legislature has decided that the conflict should be resolved in the claimant's favor."). In Cadiz, we held that "[i]n evaluating whether the burden of persuasion has been met, the 'broad humanitarian purpose of the workers' compensation statute read as a whole requires that all reasonable doubts be resolved in favor of the claimant.'" 148 Hawaiʻi at 108, 468 P.3d at 122 (citing Ihara, 141 Hawaiʻi at 41, 404 P.3d at 307). Here, since the Employer failed to produce substantial evidence that expressly, directly, and specifically rebutted the presumption that Lane's nasal injury was work-related, the LIRAB erred in concluding Lane's nasal injury was not a compensable injury. See Korsak, 94 Hawaiʻi at 308, 12 P.3d at 1249 (noting the ICA applied the correct analysis of whether doctors' reports expressly, directly and specifically rebutted the presumption that an injury was causally related to the work accident).

Based on the foregoing, we conclude that the LIRAB's FOFs 7-10, 12, and 19-20 and COL 4 are clearly erroneous. Accordingly, they are vacated.

39

## V.    CONCLUSION

For these reasons, we vacate the ICA's September 27, 2024 Judgment on Appeal; vacate in part the LIRAB's November 26, 2019 Decision and Order and January 22, 2020 Order Denying Reconsideration as they relate to the LIRAB's FOFs and COL that Lane did not sustain a compensable work-related injury to her nose; affirm the DLIR Director's December 30, 2016 decision finding Lane's nasal injury was compensable; and remand the case to the LIRAB for further proceedings consistent with this opinion.

| | |
|---|---|
| Michael J.Y. Wong<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Todd W. Eddins |
| Brian G.S. Choy and<br>Keith M. Yonamine<br>for respondents | /s/ Lisa M. Ginoza |
| | /s/ Vladimir P. Devens |
| | /s/ Steven R. Nichols |

